No. 30,406.

The Ismert-Hincke Milling Company, *Appellant*, v. The Estate of Theodore F. Ismert, Deceased, *Appellee*.

(13 P. 2d 279.)

Opinion filed July 9, 1932.

*A. L. Berger*, of Kansas City, and *Homer H. Berger*, of Kansas City, Mo., for the appellant.

*O. Q. Claflin, Jr.*, of Kansas City, *John B. Gage, Paul Barnett* and *C. V. Garnett*, all of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

Burch, J.: In his lifetime Theodore F. Ismert signed a note payable to the Ismert-Hincke Milling Company. After his death the note was allowed by the probate court as a claim against his estate. The administrator appealed to the district court. In the district court the verdict and judgment were for the administrator. The milling company appeals.

Execution and delivery of the note were admitted. The ques-

tions submitted to the jury were: first, whether the maker understood the purpose and consequence of signing the note; and second, whether he signed as the result of undue influence. The contention here is that the verdict was not sustained by any substantial evidence.

The Ismert-Hincke Milling Company is a corporation engaged in the business indicated by its name. It has a capital stock of one million dollars, divided into ten thousand shares. Theodore Ismert owned 2,392 shares, of the par value of $239,200, and was president of the company. George Hincke, a brother-in-law of Theodore Ismert, was vice president, and a large stockholder. Henry Ismert, a cousin of Theodore, was secretary and treasurer, and had charge of the books and accounts.

Theodore Ismert was a large, powerful man, of great business ability, and of dominating mind and character, and was the chief figure in the management of the milling company's affairs. His death occurred on September 4, 1924, and was caused by sarcoma. In July his physicians relinquished hope of his recovery. Treatment was then directed to making him as comfortable as possible while the disease progressed steadily to the end. The palliative treatment commenced with bromides and chloral hydrates. Then his physician commenced to use morphine, to allay pain and to induce sleep. Morphine was administered for a time through the mouth, and then hypodermically. The dose at first was a quarter grain. The dose was increased as time went on to half a grain, and was administered more frequently. Continued use of the morphine had a cumulative effect, which with toxic consequences of the disease tended to produce stupor.

During July Theodore Ismert was quite active in attending to business. On August 2 he was at his office the last time. After he was confined to his home he kept in touch with his business. The note sued on was executed on August 5. After that he conducted important business transactions, some of which were adopted and vouched for and the benefits of which were appropriated by those now interested in defeating liability on the note.

After the world war the milling company encountered difficulty in disposing of certain of its products, and the Sun Ray Products Company was organized to provide an outlet for those products. Sun Ray's specialty was ready-mixed pancake flour. Its capital of $125,000 was principally subscribed by shareholders and others con-

nected with the milling company. Theodore Ismert was the largest shareholder. He owned 505 shares, of the par value of $50,500. The milling company was the financial backer of the Sun Ray company. The milling company supplied funds to erect Sun Ray's plant. Sun Ray would purchase large quantities of mill products on account, and in July, 1924, Sun Ray owed the milling company $168,357, and owed Theodore Ismert personally $4,816.76.

About the time it became known that Theodore Ismert could not recover, the annual meeting of the board of directors of the milling company occurred. Theodore Ismert himself attended the meeting and presided. His son, John Ismert, the present administrator of his estate, was a director and was secretary, and attended the meeting. The meeting occurred on July 16, 1924, and a resolution was formally adopted instructing the management to secure settlement of the debt due the milling company from the Sun Ray Products Company. The record discloses no dissent from this resolution.

The resolution referred to necessarily precipitated a crisis in the financial affairs of Sun Ray. Sun Ray could not secure credit from others which was denied to it by the milling company, and Sun Ray was in urgent need of funds or credit for two purposes: first, to pay the milling company, and second, for operating purposes. After repeated conferences between those who were interested, solution of the problem took the form of two propositions: first, that Theodore Ismert should give his note to the milling company for Sun Ray's debt, and Sun Ray's obligation to the milling company would be cancelled; and second, to provide Sun Ray with working capital, Theodore Ismert and George Hincke would deposit securities with a bank upon which Sun Ray might draw funds to the amount of $50,000. Neither proposition was of any avail without the other. It was useless for Theodore Ismert to take over the indebtedness of Sun Ray to the milling company unless Sun Ray were provided with working capital, and it was useless to provide working capital if Sun Ray were obliged to pay the milling company.

There is no dispute that discussions concerning what should be done about Sun Ray's affairs culminated in an agreement that Theodore Ismert and George Hincke would provide Sun Ray with working capital. Pursuant to the agreement, George Hincke deposited with the First National Bank of Kansas City, Mo., government bonds to the amount of $25,000. Theodore Ismert deposited the certificate for his milling company shares. George Hincke signed

an instrument guaranteeing payment to the bank of advances to Sun Ray up to the sum of $25,000, and Theodore Ismert signed an instrument of the same tenor. The credit thus supplied was used by Sun Ray.

As indicated, discussion between Theodore Ismert and others interested in Sun Ray and the milling company, concerning the best way to deal with the situation created by the milling company's action respecting Sun Ray's indebtedness, progressed from some time after July 16. Several solutions were considered, but were not adopted. J. A. G. Badorf was manager of Sun Ray, and was soon to become a director and vice president. The testimony of Badorf and George Hincke was that Theodore Ismert finally announced he would take over Sun Ray's indebtedness, and George Hincke then said he would help to provide Sun Ray with working capital. The result was that Allendorfer, vice president of the First National Bank of Kansas City, Mo., was called to Theodore Ismert's office. Badorf testified that after Mr. Allendorfer got there, there were present Theodore Ismert, Mr. Hincke, and himself. Mr. Allendorfer was not acquainted with Mr. Hincke, and was introduced. Following the introduction, Mr. Hincke opened the conversation by stating why Mr. Allendorfer was called there. The milling company had been advancing money to Sun Ray, Mr. Ismert was going to give his note for that indebtedness, and he and Mr. Hincke wanted to arrange funds for Sun Ray. Mr. Allendorfer said he thought that could be easily arranged. Mr. Allendorfer was told that Mr. Hincke had agreed to guarantee half of fifty thousand dollars, and that Mr. Ismert would guarantee the other half. Mr. Hincke asked Mr. Allendorfer what the bank would require, and Mr. Allendorfer said, "Well, you can either put up collateral or make a financial statement." Mr. Hincke said he did not care about making a financial statement, and asked Mr. Allendorfer if they would accept liberty bonds. Mr. Allendorfer said that would be entirely satisfactory. Mr. Ismert said he had no bonds he could put up, but he would pledge his Ismert-Hincke stock, if that would be acceptable. Mr. Allendorfer said that would be all right, he knew what the Ismert-Hincke Milling Company was, and his stock would be acceptable as a guaranty. George Hincke's testimony was to the same effect. The precise day the meeting occurred was not definitely stated, but it occurred the latter part of the week, and probably on Friday. The guaranty signed by Theodore Ismert was dated August 5.

Concerning the date of execution of the guaranty, Martin E. Ismert, Theodore's son, president of the Sun Ray Products Company, and a witness for the defense, gave testimony abstracted as follows:

"Being shown exhibit No. 6, the guaranty, and having my attention called to the date, August 5, 1924, I will state that it had been agreed on, but I don't believe it had been signed."

Theodore Ismert's note to the milling company was signed in the evening of August 5. In the evening of August 6 the board of directors of Sun Ray Products Company held a meeting. Martin Ismert, the president, presided. The minutes of the meeting show the following:

"The president announced that the books of this corporation showed an indebtedness to the Ismert-Hincke Milling Company of $168,357, and further indebtedness to Theodore F. Ismert of $4,816.76, which indebtedness prevented this corporation from obtaining further credit or operating capital. That the debt of this corporation to the Ismert-Hincke Milling Company had by the Ismert-Hincke Milling Company been charged to Theodore F. Ismert, and that Theodore F. Ismert thereupon succeeded to the rights of the Ismert-Hincke Milling Company against this corporation; and that the officers of this corporation offered to Theodore F. Ismert a demand note of this corporation, secured by a mortgage upon its assets, of the total of $173,156.76, to be held by Theodore F. Ismert pending the liquidation of the contracts now held by this corporation, and the further financing of this corporation.

"The president also stated that Theodore F. Ismert and George Hincke had offered to aid and help this corporation in securing operating capital in the amount of fifty thousand ($50,000) dollars.

"Whereupon, the following resolution was offered:

" 'Be it resolved, That this corporation, by and through its board of directors, execute to Theodore F. Ismert a demand promissory note in the sum of $173,156.76, in payment of the obligation heretofore held against this corporation by the Ismert-Hincke Milling Company, and also the obligation heretofore held against this corporation by Theodore F. Ismert, and that the same be secured by a mortgage upon the assets of this corporation, duly made and executed to Theodore F. Ismert. That this corporation proceed forthwith to fill all contracts and orders for merchandise now in its possession, and to turn all available proceeds thereof to Theodore F. Ismert to apply upon the aforesaid note, and thereby enable him to cancel the obligation heretofore held by the Ismert-Hincke Milling Company.

" 'Be it further resolved, That this corporation execute such other and further notes as may be necessary to secure operating capital, as provided for in the offer of Theodore F. Ismert and George Hincke.' "

Martin Ismert testified he offered the resolution which was adopted. A resolution to keep the bank account of the company at the First National Bank of Kansas City, Mo., was also adopted. The meeting adjourned, to meet on Friday, August 8, at 7 p. m.

The board of directors of Sun Ray met pursuant to adjournment, at the office of the company, at 7 p. m., August 8. Martin Ismert

was not present, and Badorf presided. The minutes of the meeting show the following:

"The president announced that arrangements had been made at the First National Bank at Kansas City whereby this corporation can obtain an operating capital of fifty thousand ($50,000) dollars, and the acceptance of the offer made by George Hincke and Theodore F. Ismert, as provided in the last meeting of this board.

"Upon a motion duly made, seconded, and passed, the following resolution was unanimously adopted:

" 'Resolved, That M. E. Ismert and J. F. Martinsen are hereby authorized and empowered to borrow on behalf of this corporation from the First National Bank of Kansas City, Kansas City, Mo., from time to time, such sums of money as such officers or either of them may deem expedient, not exceeding in the aggregate principal amount at any one time the sum of fifty thousand ($50,000) dollars, on such terms and conditions as such officers so acting hereunder may approve, and to make and deliver the notes, obligations, or other agreements of this corporation, for the repayment of any sums so borrowed, in the form required by said bank, . . .'

"The secretary thereupon presented to the meeting a note made out to Theodore F. Ismert, in the sum of $173,156.76, payable on demand, six per cent interest, and also mortgage covering the assets of the corporation wheresoever located, securing the said note, whereupon the following resolution was offered, and unanimously adopted:

" 'Be it resolved, That the president and secretary of this corporation be and are hereby authorized to execute the note and mortgage of this corporation, which note is for the sum of $173,156.76, payable on demand, to Theodore F. Ismert, with six per cent interest, and that the same be delivered to Theodore F. Ismert, and copy thereof filed with the secretary of this corporation. That the same be executed and delivered to Theodore F. Ismert in payment of the debt and obligation now owing as provided in the resolution adopted by the meeting of this board on August 6, 1924.' "

The note referred to was executed under date of August 8, 1924, by the Sun Ray Products Company, by Martin E. Ismert, president, and Joseph F. Martinsen, secretary. At a meeting of the board of directors held on August 16 the resolutions of August 6 and 8, relating to the giving of a mortgage, were rescinded. Rescission was necessary because a mortgage on Sun Ray's assets would obviously impair its credit. At the meeting of August 16 Martin Ismert, the president, presided, and the minutes show the following:

"The action of Mr. Theodore F. Ismert and Mr. Geo. E. Hincke through which it was possible for this company to obtain loans at the First National Bank of Kansas City, Mo., was then discussed, and on motion properly made and seconded, it was decided that inasmuch as Messrs. Geo. E. Hincke and Theo. F. Ismert, having pledged certain securities with the First National Bank, through which this company has been able to obtain a considerable line of credit at the First National Bank of Kansas City, Mo., and inasmuch as this action on their part was done without cost to the company, that at the

earliest possible date these pledges be released, and the securities returned to the respective owners."

The record of the meeting of August 8 indicates that Theodore Ismert's signed guaranty and indorsed certificate of stock were in the bank before that meeting occurred. How they reached the bank is disclosed by the testimony of Martin Ismert, and the testimony of Clement Ismert, who was also a witness for the defense. Clement Ismert was Theodore Ismert's son and was his father's chauffeur.

Martin called Clement by telephone and told Clement to go to Henry Ismert's office, get a paper, and then go to Martin's office. Clement got the paper at Henry Ismert's office and went to Martin's office. Martin had gone to his father's safety-deposit box and had gotten his father's certificate of milling company stock. When Clement arrived Martin gave the certificate of stock to Clement and told Clement to "take it over and have father sign it." Clement took both papers to his father's house. His father signed the guaranty to the bank and signed the blank assignment of the certificate of stock. After they were signed Clement took both papers to Henry Ismert, who took them to the bank. Clement did not know what "the white paper"—the guaranty—was, he had not read it, nobody told him what it was, and he did not learn what it was until long afterward.

Nobody was present when Theodore Ismert signed the instruments, except Clement. At first Clement said he did not believe he had any conversation with his father, but "perhaps" he pointed to the place where his father should sign; "very likely" he pointed to the place where his father should sign; "he believed" he pointed to the place where his father should sign; and "he showed his father where to sign." Clement had given testimony at a previous trial, and at that trial he was examined by the court. Under examination by the court he said his father asked him why he brought the stock there, and he replied, "Martin told me to get that stuff there and have him sign it." At the instant trial Clement said the answer he made to the court at the former trial was true when given, and was still true.

The result of the foregoing is, Clement came into his father's room with some papers. Whether his father was in bed, or was in his chair, is not disclosed. There is no evidence that Theodore Ismert was not perfectly alert. Without any preliminaries he immediately recognized the certificate of milling company stock, supposedly rest-

ing securely in his safety-deposit box, and asked Clement why he had that stock there. Clement explained that Martin had sent the papers for signature. There is no evidence that the explanation was not perfectly apprehended. The papers were signed with pen and ink, and there was expert testimony by a witness for the defense that the signatures were good signatures. There was evidence for the defense that pen and ink were kept on a table in the room. Clement told what he did, enlarging on his pointing, as has been indicated. He did not pretend that he got the pen and ink and arranged a place where the papers might lie, so that his father could sign them, and the inference is his father made his own preparations and executed the instruments pursuant to his agreement to execute them in order to provide working capital for the Sun Ray Products Company. No court would be authorized to tolerate a finding to the contrary.

The court does not overlook the testimony of Martin Ismert, who said his father was not capable of knowing what he was signing. Martin was not present, and his opinion, expressed without knowledge of the facts at the time the conduct was manifested, does not rise to the dignity of testimony sufficient to raise a conflict in the evidence.

It is essential to a proper understanding of the case that something should be said here about Martin Ismert's attitude at the trial. Martin Ismert's testimony concerning agreement that his father would join in providing working capital for Sun Ray, his report as president of Sun Ray to his board of directors, the resolution he introduced, and the resolution of the board that he and Martinsen should deal with the bank in making use of the credit obtained, have been referred to. It would follow that Theodore's· signature was a matter of detail in the consummation of a well-understood business arrangement, and Martin sent the papers to his father by a boy who did not know what one of them was. However, Martin said his father was not capable of knowing what he was signing, and Martin said he used the credit and borrowed money of the bank on his father's guaranty and the certificate of stock. The result is, Martin's testimony leaves him in this situation: Either he was vaporizing, under oath, in court, or he betrayed George Hincke and sent the certificate and guaranty to his incompetent father for worthless signatures so he could use them as false pretenses to get money from the bank.

On August 20 Theodore Ismert made his will under circumstances

which will be described. After his father's death Martin presented the will to the probate court for probate. Normally a business man of Martin Ismert's experience would know that testamentary capacity is essential to the making of a probatable will. The petition for probate of the will was in writing. The writing stated that at the time of the execution of the will Theodore Ismert was of sound mind and memory and not under any restraint. The writing was signed by Martin Ismert. Below the signature appeared a written oath that Martin Ismert had read the petition, knew its contents, and all of the statements it contained were true. He subscribed the oath, and the oath was administered to him by Henry Mead, the probate judge. In the instant case Martin testified he did not read what he signed and was sworn to in the probate court, and that in making his will his father did not know what he was doing. The result is, Martin trifled with the sanctity of an oath in one court or the other.

Theodore Ismert was at his office in the forenoon of Saturday, August 2. Henry Ismert, secretary and treasurer of the milling company and in charge of its books and accounts, testified that on Saturday, August 2, Theodore Ismert came to him and said he would give his note for Sun Ray's indebtedness, and testified further as follows:

"After Theodore Ismert told me that he would sign the note to Ismert-Hincke Milling Company to straighten out Sun Ray's account with the milling company, I went into the bookkeeper's office and verified the account; that is, the amount. It was not right away, but a few minutes afterwards I made out the note. I made out the note at the request of Theodore Ismert. . . . When I made it I took it in to Mr. Theodore Ismert for him to sign, but he had gone home. . . . At the time I made out the note on Saturday, I did not know how long it was to run. I left that part of the note blank. In other words, I left that part of the note blank here which now reads, 'on or before ten years.' That was blank when I prepared it, and I left it blank because Mr. Ismert had not told me how long he wanted the note to run."

The testimony discloses no definite understanding that Theodore Ismert was to sign the note to the milling company on Saturday, but it is plain the situation was such that prompt closing up of the arrangement was desirable. George Hincke's bonds were in St. Louis. Immediately after the meeting with Allendorfer, George Hincke went to St. Louis to get his bonds, and then went on to his permanent residence in Pinckneyville, Ill. Allendorfer was to furnish the papers the bank required—the guaranties. When furnished, it was

necessary that George Hincke's guaranty be forwarded to him for signature. The following letter, dated August 4 (Monday), from Henry Ismert to George Hincke, at Pinckneyville, reveals the progress of certain events up to the time the letter was written:

· "Received your letter with the bonds, and have just returned from the bank with the papers for you to sign, which you will find inclosed herewith.

"Theo. was not able to come over to-day, but telephoned that he would be here to-morrow. Maybe I will go to his house this evening, and have him execute his papers and sign the note for I. H. He will have to come over tomorrow to get his stock for the collateral.

"I will not do anything with yours until his part is fixed.

"I do not think the bank will ask for all of his stock, but maybe it would be better there, and then we would know where it is.

"It has been very sultry here to-day, and am about all in, so will cut this short.

"We have sold·close to 7,000 barrels to-day, and will be a little short in the morning. However, shall buy enough cash wheat to even up."

Counsel for the defense say in their brief the letter just quoted related to the arrangement for Theodore Ismert and George Hincke to execute guaranties for money borrowed by Sun Ray. That is true. But it also related to the weather, to milling company business, and to facts of the highest importance which counsel ignore.

Anyone acquainted with the circumstances and accustomed to the interpretation of writings would say that Henry Ismert was writing a plain, frank letter to a friend and business associate. The letter shows that Theodore Ismert was not able to go to his office on Monday; that he was doing his own telephoning; and that he telephoned Henry Ismert he would be at his office on Tuesday. The letter also shows that signing of the note to the milling company was just as much one of the things to be done by Theodore Ismert as execution of the papers to the bank.

The letter refers to the amount of stock the bank might require of Theodore Ismert as security. Martin Ismert testified the bank required his father to put up every share of milling company stock he had. There is no foundation in the record for the statement. Martin Ismert had no part in negotiating with the bank for credit for Sun Ray, and the facts have been narrated. Besides that, the certificate of stock is in evidence. It was certificate No. 1, issued by the Ismert-Hincke Milling Company to Theodore F. Ismert, for 2,392 shares of the capital stock of the company, and there was no reason why this share certificate should be surrendered and two

certificates should be issued, so that one could be used temporarily as security to tide Sun Ray over its difficulties. The bank's advancements were repaid by Sun Ray, the securities were returned, and $40,000 were paid on the milling company note, all within a few months. Orders were taken by Sun Ray in the customary way for goods subsequently to be manufactured and delivered. These orders were not entered on the books as assets until delivery was made. An audit of the books of Sun Ray covering the period January 1 to June 30, 1925, showed what was called "loss" of $73,054.56; but the company had made actual sales amounting to $550,500, with all advertising and selling expenses paid.

Martin Ismert testified positively that previous to August 2 there was no discussion between Badorf and his father concerning Theodore Ismert's giving his note to the milling company and Sun Ray giving Theodore Ismert a note and mortgage. Then he testified as follows:

"Prior to August 2 Mr. Badorf came into my father's office and called me from an adjoining office, and said: 'Now, we are having trouble,' or words to that effect. 'Mr. Theodore Ismert, why don't you sign a note to Ismert-Hincke Milling Company'; that is what happened. He said: 'So that we can borrow money for Sun Ray.' I recollect such a conversation."

At the first trial Martin Ismert gave the following account of what occurred between his father and Badorf:

"Mr. Badorf went into my father's office, called me in there, and said: 'Now that you two and I are together,' he says, 'we got to do something right away.' He says he had men on the road, and salaries due, and he said Ismert-Hincke won't give us any more credit, and he says they are threatening a suit. He says: 'Mr. Ismert, why don't you do what they want you to do, sign a note to Ismert-Hincke Milling Company'; and he says, 'Sun Ray will protect you by a note and mortgage.'"

At the instant trial Martin Ismert said this testimony was true when given, and was still true.

Martin Ismert testified further as follows:

"Mr. Badorf was general manager of Sun Ray. He had no connection with Ismert-Hincke. When he came to father's office to discuss the matter of father giving a note to Ismert-Hincke for Sun Ray's account, he was interested in keeping his job. If father signed that note Sun Ray would run and he would keep his job. At that time Ismert-Hincke had cut down on Sun Ray's credit. I knew that. That was what was bothering Mr. Badorf, and the purpose of his visit was to try to get credit for Sun Ray. He wanted Sun Ray to run. He suggested father pay the debt of Ismert-Hincke; that is, give his note to the Ismert-Hincke company. That was Mr. Badorf's suggestion at that meet-

ing. I was there. The note that is here in question was given to Ismert-Hincke. They got a note that he signed. We have never admitted it. I knew it was to take up Sun Ray's balance."

This testimony fully corroborates the testimony of Badorf and George Hincke, and establishes these facts: Nobody would lend Sun Ray money, and Sun Ray had to clear up its indebtedness to the milling company. Badorf talked to Theodore Ismert about the situation in Martin Ismert's presence. Badorf wanted Theodore Ismert to take up Sun Ray's indebtedness by giving a note to the milling company, so that Sun Ray could borrow money. The purpose of giving the note was to get credit for Sun Ray. If the note was given, Sun Ray would run. The note was given, and Martin Ismert knew it was given, to take up Sun Ray's indebtedness. Whether Martin Ismert admitted the note was a valid instrument is of no consequence. The giving of the note was agreed to as an integral part of the financial arrangement to sustain Sun Ray's credit and keep it a going concern, which included deposit of securities with Allendorfer's bank, and it would be fatuous to contend to the contrary.

The date of the board meeting at which Martin Ismert was elected president of Sun Ray is not disclosed. He severed his connection with the sales department of the milling company on Friday, August 1, the day the meeting with Allendorfer doubtless occurred in Theodore Ismert's office. A few days later Martin Ismert was presiding at a board meeting as president of Sun Ray. He did not deny that he wanted Sun Ray to continue in business quite as much as Badorf. On the other hand, he testified he wanted Sun Ray to run, and it is manifest that whether he was to be president of something or nothing depended on what his father did. The minutes of the board meeting of August 6, showing Martin's announcement of substantial fulfillment of just what Badorf had recommended, and showing the resolution introduced by Martin and adopted by the board to give Sun Ray's note to Theodore Ismert for the amount of Sun Ray's indebtedness to the milling company which Theodore Ismert had taken over, have been printed above.

The milling company's books were written up to show Sun Ray was credited with Theodore Ismert's note on August 2. When produced at the trial, Sun Ray's books had been mutilated, but they had been written up originally to show Theodore Ismert's account was credited on account of "Note to I. H." on July 31. Martin Ismert mutilated the note which, pursuant to resolution of the board of di-

rectors, Sun Ray executed to Theodore Ismert for the milling company's indebtedness, but the note was carried on Sun Ray's books.

Martin Ismert testified that on Saturday he happened to be in his father's office and heard a conversation between Theodore Ismert and Henry Ismert. He testified that Henry Ismert said Sun Ray was broke, the bank would ask questions, and the bank might refuse to lend money which would be needed to buy a lot of wheat. That must have been great news to Theodore Ismert, who had been grappling with the milling company-Sun Ray problem ever since July 16, and who had already definitely arranged for credit for Sun Ray at Allendorfer's bank. However, Martin so testified, and his testimony continued as follows:

"Q. What did your father say? A. My father said he didn't see why he should have to sign that note any more than George Hincke or Henry Ismert or Mr. Laumeier. He said he is no more responsible than they were.

"Q. Well, what else was said then? A. Well, Mr. Henry Ismert said that he did not have enough stock; his note would be no good; and he said Mr. Laumeier was, I believe, in Europe; they could not get him to sign, and that Mr. Hincke, his stock was divided up in their estate and he didn't think the bank would take Mr. Hincke's note; and that his note was the only note that would be any good, because it represented the biggest individual lump of stock at that time.

"Q. Well, did your father make any reply to that? A. My father said he didn't see why he should. And there was maybe a little conversation back and forth; and I told my father that—I said to my father he should not sign, I could not see why he should sign; and I believe Mr. Henry Ismert walked out, and I may have had a few words with my father, and I walked out, bade him 'goodbye,' then I went in my other office.

"Q. How did your father act after this conversation when Mr. Henry Ismert walked out? A. I went back to my office and gathered up my things, and stuck my head in my father's door to bid him good-bye; and that was the first time I ever had seen my father cry. He was lying—his head was on his arms on the desk, and he was crying.

"Q. Now you were not present when he left? A. I don't believe I was, no. I told my brother, who was standing out in the hall, to go in and take dad home.

"Q. But you didn't see him go home? A. No, I didn't see him go home.

"Q. When is the next time you saw your father? A. The next morning."

It will be observed that Martin Ismert did not testify that in this conversation with Henry Ismert, Theodore Ismert refused to sign the note.

There was testimony that on Saturday, August 2, after Theodore and Henry Ismert had talked at length about giving the note, Henry had gone, Martin had found his father crying and had told his

brother to take his father home, Martin had gone, and his father had gotten over crying, Henry Ismert came back and commenced to talk about giving the note, just as if it were a new subject. The testimony came from John Ismert.

John Ismert testified he was in and out of his father's office for about an hour. About 11 o'clock Henry Ismert came in. No one was present except Theodore and Henry and John. A conversation occurred in which John participated. He was asked what occurred. He was administrator of Theodore Ismert's estate, and objection was made that he was not a competent witness. Counsel for John Ismert, administrator, made the following statement:

"The purpose of this question, your honor, is for the sake of bringing out the conversation, in order to show the general actions and demeanor of Mr. Theodore Ismert, and any facts in relation to his mental condition at that time, and not for the legal effect of anything that he may have said."

Then followed a colloquy between court and counsel. At the conclusion of the colloquy, and before the witness answered, the court instructed the jury as follows:

"THE COURT: On account of the statements which have been made by counsel to the court, the court is going to allow that conversation to be given to the jury; but the jury is at this time instructed that the reason for allowing that conversation to go before you is for the sole purpose of enlightening the jury as to the mental condition of Mr. Ismert at the time these conversations were had."

The witness then testified as follows:

"I was sitting back of my father on the davenport he had in his office, and Mr. Henry Ismert came in. He said, 'Theodore,' he said, 'we have got to have this note signed'; and dad said, 'Henry, I cannot sign that note, and I won't sign it.' He said, 'Theodore, the mill will go busted along with Sun Ray—'

"Q. Who said that? A. Henry. Henry Ismert said it, the mill would go busted along with Sun Ray; that the mill needed capital to buy wheat; that they will have to make a bank statement, a statement to the bank. Now, I told Henry, I said, 'Papa will not sign no'—

"MR. H. H. BERGER: Wait a minute. That is—
"THE COURT: That is objectionable.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"Well, my father was—just got over a crying spell, I suppose, before I got there, shortly before I arrived at the office. . . . He was laying over his desk. . . . His condition was swollen, so I seen, here in his neck, and the swelling was going up here in his arm, his right arm."

In the brief of counsel for the defense the language of John Ismert relating to refusal to sign the note is repeated as contradicting

the testimony of Henry Ismert that Theodore told Henry Theodore would sign the note. In view of the statement of counsel regarding the purpose of the testimony, and in view of the court's instruction to the jury, the argument has no place in a brief in this court. So far as the testimony of John Ismert bore on what counsel represented to the court it was offered for, Theodore Ismert's mental condition, the testimony showed Theodore Ismert was in full possession of all his mental faculties and in full command of his powerful will.

Clement Ismert testified he took his father home from the office before noon, about 11:30. Either Martin or John had just left the office. On the way home Theodore seemed downhearted and depressed.

The result of the foregoing is, there was no evidence that up to the time Theodore went home from his office on Saturday, August 2, he had refused to sign the note to the milling company to take up Sun Ray's indebtedness. No attempt was made to show a subsequent refusal. As indicated, his previous agreement to sign the note was established beyond question.

On Sunday, August 3, Theodore Ismert spent most of the day going from place to place in his automobile. His son Clement acted as chauffeur. Early in the morning they started out and drove about without having any particular destination in view. They happened to be going on a certain road and turned in at Martin's house. Leaving Martin's house, Martin accompanying them, they went to Badorf's house. They then returned to Martin's house and left him there, but did not stay. Then they went home and had dinner. After dinner they drove to a farm Theodore owned in Missouri. Leaving the farm, they took a boulevard near Independence, and came back to Kansas City. They stopped at Doctor Gray's house. Doctor Gray was Theodore's attending physician. Then they went home, arriving about nine o'clock in the evening. Clement testified that every place they went was at his father's suggestion.

Martin Ismert testified that while his father was at his house he was in a highly excited mental condition; he talked wildly in a high tone of voice—almost yelled—went from one subject to another, and could not carry on connected, intelligent conversation. He wanted animal cages and bird houses built on the farm, was going to have a big show out there, and for the first time Martin noticed

his father was talking "out of his head." One thought, however, constantly recurred to him, and that was the financial condition of Sun Ray Products Company. He would ask if Sun Ray was "busted," and then say they were worth a lot of money; would ask if they were broke, and then ask how much money they were worth; and Martin said if his father asked him once he asked him fifty times, "Sonny, is Sun Ray busted?"

As indicated, Badorf was manager of Sun Ray, and Theodore wanted to see Badorf and get some information from him. Apparently it did not occur to Martin that his distraught father needed a doctor, needed something to quiet him, and needed to be taken home and put to bed, and so to Badorf's they went. Martin Ismert testified as follows:

"There was quite a little discussion at both places as to the amount of material that was booked by Sun Ray. By booked I mean business, stuff that we already had sold, and the goods had to be manufactured and delivered, and to be able to do that we would have to have some additional working capital. Later we did use father's guaranty and Mr. Hincke's guaranty at the First National Bank to get that working capital. Father specifically asked Mr. Badorf about the bookings, about how much stuff they had sold, on their books to manufacture and deliver, and he discussed it with me, but he discussed with Mr. Badorf what profit there would be on these bookings, and that was discussed back and forth between Mr. Badorf and my father on that Sunday. That was on August 3, the day following the conversation at the meeting I spoke of between Henry Ismert and father in the Ismert-Hincke Milling Company."

Badorf's testimony, not subsequently disputed or corrected or supplemented by anybody, follows:

"He came there with Clem Ismert and Martin Ismert, his two sons. It was just before noon on Sunday, August 3. I think it was the first Sunday in August. That was a few days after the conference that I had in his office with Mr. Allendorfer and Mr. Hincke. It was the following Sunday.

"When he came there he talked about the volume of business which the Sun Ray company had booked, and also about the cost of pancake flour per case, and the margin of profit there was in each case. At that conference he never at any time asked the question, 'Is Sun Ray busted?' There were only two things that were discussed then, as I remember. That is, he asked about the volume of business that had been booked, and he asked about the cost per case, and the margin of profit the company would make per case. He also asked how closely the cost of the various ingredients had been figured, and asked me whether this had been figured to five and six decimal places. I told him they had, and they had been figured in some cases to seven or eight. I did not have the statement I had prepared of Sun Ray's financial condition at the house. I remember this: I could not tell him definitely what the costs

amounted to, but I offered to go down to the office and get them and furnish them to him. He said it was not necessary, but he just wanted to know in a general way. . . . Previous to that time he had been furnished with no financial statement of Sun Ray, except I showed him a financial statement when I was at his office."

With reference to Theodore Ismert's physical and mental condition, Badorf testified as follows:

"When Mr. Ismert came out and talked to me, I noticed that in the course of half an hour he drank two pitchers of water. He said he was awfully dry. I remember that was in August, and was very warm. . . . He was very dry, and in physical distress at the time. Almost everything about the man indicated that he was sick. He did not appear to be in pain. The only thing I noticed was that he was very dry. His throat troubled him to some extent. He walked with a slight limp. I think he was affected to some extent in his left leg. . . . I didn't see any difference in him whatever, except as to his physical condition. He was mentally alert, as far as I could observe. He of course was in physical distress. Anyone who is in physical distress is affected mentally. I could not tell any difference in the questions Mr. Ismert asked me or what he wanted to know. He knew definitely what he wanted to know. I noticed he had trouble getting his breath. I don't remember the swelling. The only thing I did notice, that one of his ankles, when he was sitting there on the porch, I noticed one of his ankles seemed to be swollen. . . . I don't remember much about his color. He seemed to be a bit flushed—his face was just a little flushed. . . . At that time he went right ahead and talked, and took the same keen interest in the business he had ever since I knew him. I only want to qualify that to this extent, I very seldom talked business with Mr. Ismert."

Martin gave no testimony concerning any mental aberration or infirmity exhibited by his father at Badorf's, or on the way back to Martin's house. Martin did not see his father again that day, or until noon the next day, and the record is barren of any inquiry he made concerning his father's state of mind or physical health in the meantime.

The next day was Monday, August 4. Martin said he went to see his father, and said his father did not recognize him—was talking to himself. Martin stayed for lunch. While he was there the doctor came. After the doctor left Martin went back, his father recognized him, and they had a small conversation, but not about business. Martin was there but a few minutes, as he had to get back to his office. That evening Martin saw his father, who was in a sort of a daze, "I think muttering to himself." That was the day Henry Ismert, writing to George Hincke without any thought of fabricating testimony for use in a future lawsuit, said that Theodore Ismert was

not able to be at his office, but telephoned he would be at his office the next day.

There was satisfactory evidence that after Theodore Ismert came home Sunday evening he was tired and excited, and was "rather odd." He had one of his bad spells. Monday he was worse. Monday was one of his bad days, when he would "go out of his head." He would have a smothering spell. He could not get breath, and he did not talk very much at those times. He did not lie down, but was propped up with pillows. He had a big rocking chair, and would move from his bed to the chair, and sometimes he would be with his head at the foot of the bed. The nature of his disease was such that he had to sit up to get his breath. These spells commenced about the middle of July. He did not have them so often at first as later on. He got over the Monday spell, but was gradually becoming worse. He did not get worse suddenly; it was progressive. Theodore's daughter Irene took care of her father until August 10, when a day nurse was employed. On August 19 a night nurse was employed.

The testimony of all the witnesses, members of the family, business associates, and others, was that when in health Theodore Ismert was a man of unusually strong mind and will power, and of dominating character; and there was indisputable evidence that after his bad Monday Theodore continued, in spite of physical disability and distress, to manifest his strength of mind and will and character.

Passing for the present signature of the note in the evening of August 5, the members of the family testified that after Theodore Ismert was confined to his home, beginning Monday, August 4, his business associates visited him to talk business. His wife testified that he carried on telephone conversations relating to his business. The telephone was in an adjoining room, and his daughter, Irene, felt sure he did not use the telephone because he needed help to walk, but the testimony was a general conclusion and not her recollection of facts at any specific time. Martin Ismert testified he knew his father called George H. Davis and had Davis come over to the house. Davis was president of a grain company which did much business with the milling company. Davis said he was at the house several times, and he called Theodore on the telephone several times. The sales manager of the milling company, J. B. M.

Wilcox, testified to conversations with Theodore over the telephone, and one conversation on August 8 was established with certainty.

Wilcox and Martin Ismert made a sale of flour to Mr. Marshall, of the Bakers Service Corporation. Marshall, Wilcox, and Martin Ismert met in Marshall's room in the athletic club of Kansas City, Mo. Wilcox talked by telephone with Theodore Ismert about the sale, which was a large sale at a low price. Theodore asked what Wilcox thought about it, and Wilcox said he was not very proud of it; it was a cheap price. Theodore said he thought so, too. Wilcox testified that Marshall talked to Theodore, and that Martin talked to Theodore. In rebuttal, Martin said he did not call up his father, and nobody said he did. Martin also said he had no telephone conversation with his father. Having selected the single thing he would deny, all other details of what occurred were admitted.

As late as August 22 Theodore had an interview with George H. Davis. Theodore was worried because the milling company was not buying more protein wheat. He believed there would be a shortage of wheat of that quality. There was other testimony that this was true, and that Theodore wanted to buy 500,000 bushels of protein wheat. The result of the interview with Davis was that on August 23 Davis sold to the milling company a quarter of a million bushels of wheat. There is no dispute about this transaction, and Davis testified that, considering Theodore's physical condition, his mental condition was remarkable. It may be recalled that on August 4 Henry Ismert reported to George Hincke that on that day the milling company had sold close to 7,000 barrels, they would be short the next day, and he would buy cash wheat to even up. Assuming it required 4.6 bushels of wheat to make a barrel of flour, a quarter of a million bushels of wheat would supply wheat for about eight days' sales.

One of Theodore Ismert's amusements was playing poker. There were Saturday afternoon games at his office, in which some of his business associates and others participated. It is undisputed that after he was confined to his house he played poker from his bed in his room. The details of the arrangement whereby he could do this are described in the testimony. Mrs. Ismert and Clement said there was only one game, but those who participated testified there were two Saturday afternoon games, one on August 9, and one on August 16. The limit was a dollar, and they played dealer's choice. Clement said that in the game he knew about his father went to sleep.

He did not undertake to say his father went to sleep when it was his deal, or when he was in the pot, and those who were in the game with Theodore testified to the customary·vigor of his play.

Mr. Ismert's sending for George Davis and insisting on laying in a store of protein wheat were the last acts of his noteworthy business career. They were performed for the benefit and success of the milling company. Just before that he had put his own house in order. On August 19 he made a deed of his real estate to his wife, and on August 20 he made his will.

The will was written by George H. West, an attorney, who resides in Kansas City, Kan. His sister married John Ismert. At the time of the trial West was attorney for Martin Ismert in a pending action. Some member of the family called West to Theodore Ismert's house to draw his will. Before going West prepared a draft of the formal and usual parts of a will, in typewriting, leaving blanks to be filled. The remainder of the will was written at the Ismert home.

When West arrived at Theodore's room Theodore's wife, his daughter Irene, and his son Martin were there. Theodore was sitting in a chair. Theodore said to West, "George, I am in pretty bad shape. I want to draw my will." West said, "Well, you should not feel that way about it. I have drawn my will, and I do not expect to die very soon." Theodore then made a jocular remark to West about West's liking for women, and said something to the effect West was afraid some woman or somebody might shoot him. Irene Ismert thought her father was out of his head. Then followed a conversation between Theodore and West about the terms of the will. West testified emphatically that he learned from Theodore all the provisions to be inserted in the will. West testified there was some discussion prior to the determination of what Theodore wanted done, and Irene gave some of the details respecting a bequest to her mother. She said West asked her father how he wanted the will made. Theodore said he did not know, turned to the family, and asked them how they wanted the will made. Irene spoke up and said, "Why not leave everything in mother's name?" West asked Theodore if that was all right. It was all right, and a provision to that effect was inserted in the will. The provision follows:

"The residue and remainder of my property, both real, personal or mixed, wheresoever situated or found, including any inheritance or estate which might be willed me by my mother, I hereby bequeath, give, and devise to my beloved wife, Cecelia C. Ismert, as her own separate estate and property."

It will be observed this was a residuary clause, and contained reference to any inheritance or estate by will which might come to Theodore from his mother. West testified nothing was put in the will except by Theodore's direction, and nobody disputed him as to how that provision got in the will.

The clause preceding the residuary clause was as follows:

"I hereby give, bequeath and devise to my daughter Irene Ismert, and to my sons, Clement, John and Martin, and to my granddaughter, Edna Hellane Ismert, the sum of one dollar each."

West testified he put that specific provision in the will at Theodore's direction, and nobody disputed the testimony. The will also appointed two executors, Cecelia C. Ismert, the testator's wife, and Martin Ismert, his son, and nobody disputed the fact that West put the appointment provision in the will at the testator's direction.

West testified that when the will was written he read it to the testator. Nobody testified to the contrary, and nobody testified the testator did not understand what was read.

The testator signed the will. Who provided pen and ink is not disclosed, but there is no testimony that the testator was told where to sign. West testified the testator declared the will to be his will, and nobody disputed that fact.

There was some discussion concerning who would act as witnesses. West told the testator he would rather have some one outside the family. A neighbor, Mrs. Eoff, was or had been called. West testified that he and Mrs. Eoff signed the will, at the testator's request and in his presence, and nobody disputed that part of the execution of the will. West and Mrs. Eoff subsequently made proof of the will, and West testified that the affidavit he signed by way of proof was true.

When Irene was pressed to tell whether her father was out of his head when she answered his question and suggested the property should go to her mother, she said her father spoke queerly, she did not know whether he was out of his head or not, and she then evaded direct and candid answer. The concluding part of her testimony follows:

"Q. He was not out of his head when you had the conversation with him about how the will was to be made? A. There was no special conversation; it was really in general.

"Q. Well, it was in general. George asked your father how he wanted his will. Then your father said he did not know how he wanted it? A. Yes.

"Q. Then you made a suggestion to your father, and your father agreed to that? A. Yes.

"Q. Now, when that took place your father was not out of his head, was he? A. I don't know.

"Q. Haven't you any idea? A. Well, the remark he made later was rather queer, too.

"Q. Was this conversation had—when Mr. West came in your father said to him: 'George, I am in pretty bad shape. I want to draw my will.' Do you remember if that is what your father said? A. Something like that.

"Q. Then Mr. West said: 'You should not feel that way about it. I have drawn my will, and I don't expect to die very soon,' or words to that effect. Do you remember George saying that to him? A. Something like that.

"Q. That was more or less done in a joking manner, wasn't it? A. Yes.

"Q. Then after that, right at that time, George asked your father how he wanted the will drawn. Your father and you and Martin discussed it as to how the will should be drawn? A. Who had discussed it, please?

"Q. You and your father? A. No; just Martin and I had discussed it, downstairs.

"Q. All right. After or at the time Mr. West asked your father how he wanted the will drawn, your father then turned to you folks. Did he say anything to you? A. He asked us how we wanted the will made.

"Q. You told him, and he agreed with you; and after that was done was when Mr. West wrote it in here; is that right? A. Yes, he wrote. He did some writing."

Martin Ismert gave characteristic testimony. He was present when the will was made. Without disputing any portion of West's testimony, without telling anything that occurred, without making reference to any fact or circumstance connected with preparation and execution of his father's will, Martin said his father knew no more what he was doing than the man in the moon; you could tell him to do something, and he would do it just like a dog. The result is, there was no substantial evidence that Theodore Ismert was not competent, on August 20, to make his will. Martin's verified petition to the probate court to admit the will to probate has been referred to. The will was admitted to probate, and John Ismert, as administrator with will annexed, is defending this suit.

The foregoing demonstrates that competency of Theodore Ismert to execute the note sued on must be determined by the facts as they existed at the time the questioned act was performed.

The note was executed probably between seven and eight o'clock Tuesday evening. Doctor Gray visited his patient, and as he was leaving Henry Ismert arrived. Henry Ismert testified as follows:

"I called at Mr. Ismert's home with the note after dinner, I judge around seven or eight o'clock. There were several people there. I saw his wife, Mrs.

Cecelia Ismert. I saw her in the hall and waited there until I could go up-stairs. I went upstairs to Theodore's room. When I got there I asked him how he felt, and had a little conversation for just a few minutes. He con-versed with me. I told him I had brought the note over for him to sign. When that conversation took place I am not sure whether Martin was there then, or whether he came in just about the time I was talking about it. While talking to Theodore Ismert about the note, Martin Ismert spoke to his father, and said: 'I wouldn't have anything to do with it, if I were you; I wouldn't have anything to do with it.' His father did not answer, and after that Martin Ismert left the room. When he left the room I don't think there was anyone else in the room. Irene came in shortly afterwards."

Martin Ismert gave two accounts of what occurred. When ex-amined by his attorney in probate court he testified that he and his wife followed Henry Ismert to Theodore's room a short time after Henry went up. Martin then testified as follows:

"Q. Now what was occurring? Where was your father, and what was he doing, and what was Henry Ismert doing, when you went into the room? A. My father was lying in bed, or sitting propped up on the pillows, and Henry was sitting by his bed about two and a half feet from his head, and when Henry said he came there and wanted to know if papa would fix up the note, and they got to talking about a note, and I told my wife, I believe, to leave the room, that we were talking business, or going to talk business, and she left, and I told papa not to have anything to do with that. I said: 'I would not have anything to do with that.'"

At the instant trial Martin said the testimony he gave in probate court was true.

At the instant trial Martin testified on direct examination by his attorney as follows:

"The doctor had been up there about half an hour, and after the doctor came out, Henry went up, and my wife and I went up. My father was propped up in bed. Henry sat down at the side of the bed, and I was talking to my father, just a few words of greeting and things like that. I was standing, I think, at my father's head at the foot of the bed. His head was not at the head of the bed; on account of the air, they had propped him up down to-wards the end of the bed. Henry began to talk something about money and this note, what he talked to him about Saturday. I says he ought not. I says: 'We can't talk business here. There is not going to be any talk about any note now.' Henry came back, and I think he said they had to have that note signed. I says, 'We cannot talk about it,' and I believe I told my wife to leave the room; and I told Henry, I says, 'Now, there is going to be no note, no business talked.' And I believe I went out after that, shortly after that. My father did not take part in the conversation when I was talking with Henry. My sister came in the room just as I was going out."

There is no hint here that Theodore was denied company, or that

company visited him to hear him mutter, or out of curiosity to see the queer manifestations of mental disorder. There is no hint of stupor. Martin agrees with Henry that Theodore conversed with Henry, and conversed with Henry about execution of the note. There is no hint that what Henry had to say would be ineffective for lack of comprehension on Theodore's part. The testimony of Martin in probate court was in full accord with the testimony of Henry in the district court, that Martin broke into the conversation with a protest to his father against signing the note. In the district court Martin shifted to protest to Henry against talking business, but when his attention was called to his testimony in probate court, he admitted the protest to his father. There is no hint that his father was not likely to comprehend the protest.

It will be recalled the time the note was to run had not been fixed on Saturday. Accepting Martin's version of what occurred, we have conversation between Henry and Theodore about fixing up the note, advice by Martin to his father not to sign the note, and conversation between Martin and Henry about doing business there. Then Martin left. As Martin was leaving, Irene came in.

Henry Ismert testified as follows:

"When Irene came in, Theodore Ismert asked her where the pen was, and I asked him how long I should make the time of the note, and he said, 'Three years,' and I said, 'We will make it longer than that. It don't make any difference to me if we make it ten years.' He said, 'Well, then, make it ten years.' Immediately after he told me I put on the note, 'On or before ten years.' That was done right in Theodore Ismert's room and before he signed it. After Theodore Ismert said, 'Where is the pen,' Irene got the pen for him and handed it to him, and he signed it."

Irene gave an account of what occurred. On direct examination by counsel for defendants, she testified:

"I went upstairs after Doctor Gray had left, and Martin and Henry Ismert were in papa's room. They had been talking. I heard voices as I went in. I did not hear any of the talk. Martin left the room when I went in. Henry Ismert was by the bed in the little chair, and he took some papers out of his pocket, and he said to papa: 'Theodore, I want you to sign this note. It won't affect you any, and it is the only way we can get money at the bank.' Nothing else was said. Papa looked around, and said: 'Where is the pen?' We had the stuff on the table in his room. We always had a pen and ink, and I dipped the pen in the ink and handed him to sign, and he signed his name.

. . . . . . . . . . . . . . . . .

"Father did not say anything more. Henry Ismert put the paper back in

his book, and left the room almost immediately. Martin came back in the room about five or ten minutes afterwards, and I whispered to him that papa had signed the note. I was in father's room at the time. He was sort of dozing. That was five or ten minutes afterwards."

On cross-examination Irene testified as follows:

"I heard voices as I came to my father's room the night of August 5, but I didn't hear what was said. As I came in Martin came out. Father just looked around and said, 'Where is the pen?' He did not ask me specially. Just turned around and said, 'Where is the pen?' I just reached over and handed it to him. The pen was in his room on the table about three or four feet from him, which necessitated some one handing it to him. Father could not have reached it from the bed, and when father said, 'Where is the pen?' I went over and got the pen. I considered that father was requesting me to get him the pen. I got a magazine or something for father to write on. I put the magazine on a pillow on his lap. It was on his chest more. It was an ordinary pen. I dipped the pen into the ink bottle which was on the table. When father said, 'Where is the pen?' I went over to the table and got the pen with ink on it and brought it over to father. Then I got the magazine for him to write on. Then after Henry Ismert left, Martin came upstairs, and I whispered to him that father had signed the note."

It will be observed that Irene made no reference to any fact or circumstance indicating that her father was not mentally aware and alert, before or at the time the note was signed. There is no mention of either stupor or excitement. Henry asked Theodore to sign, and Theodore asked for the pen. When the details of the arrangement for Theodore to sign were completed, there was no relaxation of purpose, and he signed the note. The signature is a fine specimen of business chirography. Apparently Theodore scrutinized it, and gave an additional stroke to the final "t," making it taller. A photostatic copy of the signature follows:

The foregoing is all the evidence there is with reference to the signing of the note. The evidence discloses full competency to execute the instrument, and forbids any other reasonable inference.

Counsel for the defense collate from the testimony sixteen varieties of conduct displayed by Theodore Ismert during his illness, indicating he was not in command of his faculties when the conduct occurred. It is not necessary to encumber this opinion with a recital of them. The proof refuted existence of a persisting condition of impaired mentality, continually preventing the doing of business and indulgence in pleasure. None of the specified manifestations of peculiar, abnormal or irrational conduct occurred on the evening of August 5. Absence of the specified manifestations evidenced competency; the positive testimony established competency; and in the face of the proof, manifestation of irrationality at some other time was not sufficient to raise a doubt about competency to execute the note.

There was medical testimony concerning effect and cumulative effect of morphine, and about the toxic effect of the disease. The testimony was developed in a manner that it might create an impression Theodore Ismert was in a continual state of stupor from about the first of August—even while he was still going to his office. The facts which have been detailed forbid such an inference, and the medical testimony was that when Theodore Ismert was in a stupor, he could be aroused by talking to him and getting his attention, so that he understood what he was doing.

The facts of various transactions described above were stated to the attending physician, Dr. George M. Gray, who was a witness for the defense, and he expressed the opinion Theodore was so "aroused" on those occasions. The statement of facts made to the doctor relating to indorsement of the certificate of stock and signature to the bank guaranty did not correspond to Clement Ismert's testimony, and that incident is not here included. The facts of that incident, narrated above, disclosed that Theodore Ismert was not in any stupor at that time.

The salient facts attending signature of the note were stated to Doctor Gray. He said he would not say Theodore was not aroused sufficiently to understand what he was doing, and the indication was that he was aroused. In the course of his examination Doctor Gray said the facts would indicate Theodore knew what he wanted to do; the facts would indicate he knew what he wanted to do, and

carried out his wish by signing; and the doctor said he thought that when Theodore signed the note he knew what he wanted and was carrying out his wish.

The facts relating to preparation and execution of Theodore Ismert's will on August 20, fifteen days after the note was signed, were stated to the doctor, and the doctor said he thought Theodore had been aroused so he could understand what he was doing.

Doctor Gray did not testify that Theodore Ismert was in any stupor when the doctor arrived on the evening of August 4, or while he was there, or when he left, and did not testify he administered morphine while he was there. The doctor did not testify to the length of his visit. Martin Ismert said it lasted half an hour. Assuming the doctor did administer morphine, to give his patient comfort and sleep during the night, the time when the administration occurred is not known. All the testimony, lay and professional, was that morphine acted upon Theodore Ismert as a stimulant for a time—as Irene phrased it, her father would "pep up." If, therefore, Theodore had not previously been alert, there is abundant room for inference that during Henry Ismert's visit he was in the conscious condition the proof established because of the drug the doctor administered. After the disturbance Martin had raised had subsided, after the note had been signed and that business was out of the way, and after everybody had gone, Theodore commenced to doze—Irene said within five or ten minutes.

Dr. Paul Morton Krall was a witness for the defense. He saw Theodore Ismert five or six times in the period extending from the middle of July to the week previous to Theodore's death on September 4. Doctor Krall introduced into the case the subject of automatic conduct, which is conduct carried out without any thought, by so-called subconscious centers. Normal people perform automatic acts without thought of consequences, and with an individual in a toxic state the automatic factor would be most pronounced. The doctor demonstrated operation of the automatic factor in Theodore Ismert's case with great erudition and with perfect incongruity with known facts.

Theodore was going to his office the first part of August. About that time the interview with Badorf occurred, Martin Ismert being present. Then followed the interview with Allendorf, with Badorf and Henry Ismert present. Then followed the conversations at Theodore's office on Saturday, August 2. There was no testimony

that any morphine had been administered to Theodore Ismert on any of those dates, or on July 31. On July 31 Theodore Ismert wrote the following letter to his mother:

"DEAR MAMA: Your last letter received this morning. Inclosed you will find a draft for $300, which will carry you along for some time.

"I am not any better; in fact, I am still losing a lot of weight; am getting real thin, so is Celia; she is not doing any better, but she is as always quite hopeful.

"Celia's cousins from Chicago are here; that is, Julia Baltz, her daughter Frances, and Frances' boy and girl.

"I don't feel any too well, so I won't bother you with any more news. Love, from your devoted son,                                                        THEODORE."

Now the doctor was not examined with respect to letters generally, but with respect to this letter, dated July 31, from Theodore to his mother, and the doctor testified as follows:

"Q. The next statement is: 'Inclosed you will find a draft for $300, which will carry you along for some time.' You say that is automatic, too, because he might have said that before? A. Yes, sir."

The doctor finally did say he thought the letter indicated Theodore knew what he was doing, and carried out his intentions.

Doctor Krall judged all conduct strictly by medical standards, without recognition of the standards by which the law judges conduct. For example, he said every patient who comes to his office and asks about some ache or pain, and is worried about it, is eccentric. Without canvassing the doctor's entire testimony, the presentation of which fills sixty-three pages of printed abstract, the essence of it, so far as concerns competency to execute the note, is contained in the following excerpts:

"Q. That same thing is true when he signed this note on August 4, he intended to sign that note, and he carried out his intention when he signed it? A. He did.

"Q. And . . . assuming the testimony to be that he agreed to it on August 2, to sign that, on August 4 he was carrying out what he had promised to do previously? A. All right.

"Q. He did? A. He did.

. . . . . . . . . . . . . .

"Q. So, when he signed this note on August 4 he carried out his will in signing the note that he agreed to sign on August 2? A. Yes, sir.

. . . . . . . . . . . . . .

"Q. He knew what he was doing when he signed the note? A. Undoubtedly.

"Q. And he knew what he was doing when he signed the guaranty? A. He knew that he was signing it; yes, sir.

"And when he indorsed the stock on the back, he knew that he was indorsing the stock on the back? A. Undoubtedly.

"Q. In other words, he was perfectly conscious of every act that he was doing? A. That would be my opinion.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Q. I will ask you if in your opinion Mr. Ismert could know, in your opinion could know or appreciate the consequences of his act in signing this note in question? A. I do not believe that he could appreciate the act, the gravity of the act."

Mrs. Ismert testified as follows:

"I didn't mean to tell the court that Theodore Ismert didn't know what he was doing when he signed his name; he didn't realize what he was doing, . . ."

Martin Ismert testified at a former trial, and his testimony was called to his attention:

"Was this question asked you: 'But you want to tell the jury that he didn't know what he was doing when he signed the note?' And this answer given: 'He did not realize what he was doing.'

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Q. Was this question asked you: 'Did he know what he was doing?' And this answer given: 'I presume that he knew that he was signing the note.' Was that answer given? A. Yes, I think it was.

"Q. And was that answer true? A. I think it is."

There was nothing bizarre about Theodore Ismert's taking over Sun Ray's indebtedness to the milling company, but that subject need not be discussed. The real defense to the action was that when the note was signed Theodore could not comprehend the gravity or realize the consequences of his act. The quoted opinions on that subject, professional and lay, were not important. It was not necessary that when the note was signed Theodore should be able to go over in his mind the factors involved in solution of the milling company-Sun Ray problem, be able to consider afresh whether he would take over Sun Ray's indebtedness to the milling company, and be able to weigh the consequences of so doing. The gravity of that step was a matter which was settled when he agreed to give the note, some days before it was signed. There is no basis in the evidence for difference of opinion that he was competent to make that decision. If, when the note was presented to him for signature, he was able to understand it was the note the giving of which had previously been discussed, and which he had agreed to give, the requirement of competency was satisfied. Aside from what has already been said concerning actual competency when the note was

signed, we have Doctor Gray's testimony that Theodore knew what he wanted to do and was carrying out his wish, and we have Doctor Krall's testimony that he knew what he was doing and was carrying out what he had previously agreed to do.

In the case of *Parker v. Felgate,* 8 P. D. 171 (1883), a testatrix gave instructions to her solicitor with respect to preparation of her will. Later she became very ill. Coma set in, but she could be aroused. The will was prepared according to her instructions and was brought to her bedside. The will was rustled in front of her face by a physician, which roused her, she was told the paper was her will, and she executed it. The headnote of the case reads:

"If a testatrix has given instructions for her will, and it is prepared in accordance with them, the will will be valid though at the time of execution the testatrix merely recollects that she has given those instructions and believes that the will which she is executing is in accordance with them." (p. 171.)

Sir J. Hannen, president of the probate division, instructed the jury as follows:

"This being the material evidence, the law applicable to the case is this: If a person has given instructions to a solicitor to make a will, and the solicitor prepares it in accordance with those instructions, all that is necessary to make it a good will, if executed by the testator, is that he should be able to think thus far, 'I gave my solicitor instructions to prepare a will making a certain disposition of my property. I have no doubt that he has given effect to my intention, and I accept the document which is put before me as carrying it out.' Now, I have only put into language that which flashes across the mind without being expressed in words." (p. 173.)

In the case of *Perera v. Perera,* A. C. 354 (House of Lords and Privy Council, 1901), it appeared that on June 1 a person then competent to make a will gave instructions for preparation of his will. The will was prepared according to the instructions and was executed between one and two a. m., June 5. Mental capacity of the testator when the will was signed was an issue. The headnote reads:

"Where a testator is of sound mind when he gives instructions for a will, but at the time of signature accepts the instrument drawn in pursuance thereof without being able to follow its provisions, *held,* that he must be deemed to be of sound mind when it is executed." (p. 354.)

In the opinion of Lord Macnaghten it was said:

"The learned counsel for the appellant did not contend that the witnesses in support of the will were acting in conspiracy or saying what they knew to be false. He said that the will may have been, and probably was, read over to the testator, but that there was nothing to show that he followed the read-

ing of the will or understood its meaning. He adopted the argument of Laurie J., to the effect that it was not enough to prove that a testator was of sound mind when he gave instructions for his will, and that the instrument drawn in pursuance of those instructions was signed by him as his will, if it is not shown that he was capable of understanding its provisions at the time of signature. That, however, is not the law. In *Parker v. Felgate*, 8 P. D. 171, Sir James Hannen lays down the law thus: [quoting as quoted above].

"Their Lordships think that the ruling of Sir James Hannen is good law and good sense." (pp. 361, 362.)

The foregoing are will cases. The standard of capacity to execute a promissory note is capacity to understand the nature and quality of the act and to grasp its true purport and significance. If that capacity exists; if need for the giving of a note, and the consequences of giving and not giving it, have been thoroughly canvassed and debated; if resolution to execute the instrument has been made; if some abatement of capacity is then suffered; and if the subject of execution of the note is then brought to the attention of the person who made the resolution, it is good law and good sense that he is competent to execute the instrument if he is able to comprehend that execution relates to the subject which has been considered and concerning which he had formed his will. It is needless to make another summary of the evidence to show application of this law to the facts of this case.

This opinion must be brought to a close without further discussion of the defense of want of mental capacity, and the defense of undue influence needs only a word.

An effort is made to put Henry Ismert in a confidential relation to Theodore in respect to execution of the note, on account of the manner in which some routine personal and company business affairs were handled. There was no confidential relation affecting giving of the note. To be undue, influence must be unfair. In this instance all the pressure brought to bear on Theodore Ismert to execute the note consisted of fair arguments, openly presented by persons entitled to present them, and they were presented in the presence of Martin Ismert, who gave his father the benefit of his advice respecting them.

The voluminous record has been carefully considered, and the court holds there was no substantial evidence that Theodore Ismert was incompetent to execute the note, or was unduly or improperly influenced to do so.

At the close of the evidence plaintiff requested the court to give

a peremptory instruction to the jury to find for plaintiff. The instruction should have been given.

The judgment of the district court is reversed, and the cause is remanded with direction to enter judgment for plaintiff.