No. 30,406.

THE ISMERT-HINCKE MILLING COMPANY, *Appellant*, v. THE ESTATE OF THEODORE F. ISMERT, Deceased, *Appellee*.

(16 P. 2d 521.)

618

Opinion denying rehearing filed December 10, 1932. (For original opinion of reversal see 135 Kan. 745, 13 P. 2d 279.)

*A. L. Berger,* of Kansas City, and *Homer H. Berger,* of Kansas City, Mo., for the appellant.

*O. Q. Claflin, Jr.,* of Kansas City, *W. D. Jochems,* of Wichita, *E. J. Mc-Fadden, John B. Gage, Paul Barnett* and *C. V. Garnett,* all of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

BURCH, J.: A petition for rehearing challenges the court's decision that if when Theodore Ismert signed the note in controversy he understood that execution related to a subject then brought to his comprehension, the gravity of which he had considered and concerning which he had formed his will, the legal standard of competency—capacity to understand the nature of the act and grasp its purport and significance—was satisfied. It is asserted the decision is contrary to the statute of this state relating to execution of wills and contrary to the American rule on the subject.

This is not a will case; but because the set of facts held to be sufficient to satisfy the standard of competency to execute a promissory note would satisfy the standard of competency to execute a will, the assertions of the petition for rehearing may be considered.

The petition for rehearing quotes from the opinion in the case of *Wisner v. Chandler,* 95 Kan. 36, 147 Pac. 949, in which the court said the time when a contested will was made is the time of primary importance to be considered in estimating testamentary capacity. The case of *Barnhill v. Miller,* 114 Kan. 73, 217 Pac. 274, is cited as approving the Wisner case. These are the only Kansas cases referred to.

The court is pleased to find that counsel for the Ismert Estate now recognize the doctrine of *Wisner v. Chandler.* The court was obliged to extend the original opinion considerably in order to furnish a basis for the following conclusion stated in the original opinion:

"The foregoing demonstrates that competency of Theodore Ismert to execute the note sued on must be determined by the facts as they existed at the time the questioned act was performed." (*Ismert-Hincke Milling Co. v. Ismert Estate*, 135 Kan. 745, 766, 13 P. 2d 279.)

The statute of wills provides that a person "of sound mind and memory" may make a will (R. S. 22-201), and if it shall appear that the testator "at the time of executing" his will was of sound mind and memory the will shall be admitted to probate (R. S. 22-218). As indicated, the court fixed precisely the same time when sound mind and memory must exist as that prescribed by the statute of wills. What is sound mind and memory?

The statute does not answer the question just propounded, and the courts have been obliged to formulate standards. "Sound mind and memory" is an abstraction, and "a will" is an abstraction. The question in every case is, Did the particular testator have capacity under the particular circumstances to make the particular will? In trying to formulate standards the courts have dealt with the abstractions and have tried to make generalizations to fit all cases. The result has been conflict of authority and lack of harmony in the decisions of the same state.

In the case of *Delaney v. City of Salina*, 34 Kan. 532, 9 Pac. 271, the syllabus reads:

"The law does not require that a testator shall have absolute soundness of mind in all particulars, but only soundness of mind with regard to the particular matters under consideration; nor does the law require that he shall have the greatest or most perfect capacity of mind, but only such an amount and kind of capacity as will enable him to know what he is doing, the ties of relationship, his obligations to kindred and friends, and to whom he is giving his property." (¶ 3.)

Categories of characteristics of sound mind usually include ability of the testator to know the nature and extent of his property.

Redfield stated the general standard of competency to make a will as follows:

"The result of the best considered cases upon the subject seems to put the quantum of understanding requisite to the valid execution of a will upon the basis of knowing and comprehending the transaction, or, in popular phrase, that the testator should, at the time of executing the will, know and understand what he was about." (1 Redfield on Wills, 3d ed., p. 124; 2d ed., p. 113.)

In the court's opinion there is no better method of formulating ultimate standard of capacity to make a will. Of course, presence or absence of what, under the particular circumstances of a particu-

lar case, may properly be regarded as indicia of competency or incompetency will always be the basis of inference of soundness or unsoundness of mind; but in final analysis the essence of sound mind and memory, within the meaning of the statute of wills, is capacity of the testator to know and comprehend the transaction; and the whole subject would have been covered if the statement of standard of capacity made in the Delaney case had stopped with the words, "such an amount and kind of capacity as will enable him to know what he is doing."

In this instance it was sufficient that, when Theodore Ismert called for the pen and proceeded to execute the note, he knew and understood the business he was engaged in. He had sufficient knowledge and understanding of the business he was engaged in, if he comprehended that the note was the note the giving of which had been under recent discussion between him and others concerned, as a means of dealing with a pending business problem; that the consequences had been considered; that a conclusion had been reached; and that he had agreed to give the note. Having that comprehension he had mental capacity to execute the note.

The result of the foregoing is, the original opinion did not expressly or by implication abate a particle from the mental capacity required by the statute of wills, or from the mental capacity required by law to execute the note in controversy.

The petition for rehearing asserts the decision is contrary to the American rule relating to competency to execute a will, cites some authorities as stating the law on the subject, and says this court should follow the American rule. Page on Wills is quoted as follows:

"If testator lack capacity when he executes the will, the fact that he had capacity formerly does not make the will valid. A will which was prepared when a testator was sane, but which was not executed until after testator had become insane, is invalid. . . . Where testator gave instruction for drawing his will, but before it was completed he became unconscious, the draft thus made was not his will."

These quotations do state the American rule, and this court approves them; but it is obvious the quotations have no bearing whatever on the question involved in the present case.

The same lack of discrimination appears in the citation of decided cases. Thus the following quotation from *James White Memorial Home v. Haeg*, 204 Ill. 422, appears in the petition for rehearing:

"Gillespie, the draughtsman, swears that when the will was drawn she [the

testatrix] dictated it and was perfectly rational; that she knew the extent of her property and the objects of her bounty. The two subscribing witnesses swear that they believed that her mind was unsound when she signed the will, and that she inquired five or six times, directly after affixing her signature, whether the will was made. Now, with the evidence in this condition, it was not error to instruct the jury that if she were insane at the time she signed the instrument it would not be her will, even though she were rational and performed rational acts at a previous time, when the will was drawn." (p. 426.)

Comment. is unnecessary.

The petition for rehearing quotes from the opinion in the case of *In re Will of Hoover,* 19 D. C. 495. In that case there was testimony warranting an inference that Hoover had entertained for a long time a persistent and settled intention to devise and bequeath his estate for religious or charitable purposes. There was strong evidence to the contrary. The will gave a large and indefinite legacy to the mistress of a wretched old man, and gave the residue to the executor of the will and his daughters, who were not related to the testator. The court said:

"The question to be decided by the jury as to the competency of the testator to make a will, involved the inquiry whether he was of sufficient mental soundness to change any previously existing purpose he might have formed, if he should subsequently desire to do so. The mere fact that a will is in the direction of a preconceived purpose should have no weight, unless the testator was, at the time of executing the will, of sound and disposing mind; otherwise the will of an evident imbecile or madman must stand, notwithstanding it appeared that, although dictated or even written by himself when entirely competent, it had not been executed until incompetency had developed itself." (*In re Will of Hoover,* 19 D. C. 495, 508.)

Of course that is true, but the decision sheds no light whatever on what comprehension of the business the testator was engaged in at the time he executed his will would suffice to make him competent to follow or change his preconceived purpose. That is the subject discussed in the original opinion, and no American text or American decision is cited in the petition for rehearing which is opposed to this court's decision.

There was testimony the note was signed on the evening of Tuesday, August 5. Henry Ismert, who took the note to Theodore Ismert's house for signature, gave the following testimony:

"I got the note signed on the 4th. I am quite sure it was the 4th. I think it was on Monday that I got it."

The petition for rehearing contains an argument to this effect:

Monday, August 4, was concededly one of Theodore Ismert's bad days; there is testimony that he signed the note on that day, and not on Tuesday, August 5; the testimony raised a conflict in the evidence; and the jury had a right to believe, and doubtless did believe, the note was signed on August 4, and consequently while Theodore Ismert was incompetent.

Theodore Ismert's mental condition was accounted for daily, for Saturday, August 2, for Sunday, for Monday, and for Tuesday, August 5.. The testimony regarding what occurred when the note was signed, whatever the day of the week or month, forbade inference of incompetency. Mrs. Ismert testified she knew the note was signed on August 5. Martin Ismert, who saw his father every day from August 2 to August 5, and saw his father three times on August 4, before lunch, after lunch, and in the evening, testified the note was signed on August 5. Irene Ismert, who was acting as her father's nurse, testified the note was signed on August 5, and gave reasons for knowing the date. In the argument to the jury counsel for the Ismert Estate sketched the history of the case and gave August 5 as the date. In the brief in this court counsel for the Ismert Estate sketched the history of the case and gave August 5 as the date. This court gave the date as August 5. New counsel came into the case, and apparently prepared the part of the petition for rehearing under consideration. The petition for rehearing would have the jury throw out the evidence relating to what occurred the evening the note was signed, throw out the testimony of the members of the Ismert family, throw out counsel's presentation to them of the history of the case, and seize upon a bit of testimony regarding a date and found a verdict upon it. The court regards the contention as chimerical.

The petition for rehearing complains that in holding the district court should have directed a verdict for plaintiff, this court considered facts developed on cross-examination of witnesses for the Ismert Estate which did not square with the testimony given on direct examination. The premise is true, but it affords no ground for complaint.

The note in controversy was presented to the probate court as a claim against Theodore Ismert's estate. The claim was allowed, and an appeal was taken. The record before this court discloses it is a record made at a second trial. The petition for rehearing states

the first verdict was in favor of the Ismert Estate, and the trial court set the verdict aside.

Whether Theodore Ismert was competent to do a specific piece of business on the evening of Tuesday, August 5, the evening the note was signed, was the issue in the case. On direct examination Martin Ismert testified he went up to his father's room and found Henry Ismert there talking to his father about a note. Martin protested to Henry. He said to Henry, "We can't talk business here." Henry "came back" and said they had to have the note signed. Martin told his wife to leave the room and said to Henry, "There is going to be no note, no business talked." The inference from this testimony was that because of Theodore Ismert's mental condition business talk was wholly out of place there.

At the hearing in probate court Martin gave a different account of what occurred. He said Henry "wanted to know if papa would fix up 'the' note," and they got to talking about a note. Martin told his wife to leave the room, that "we are talking business, or going to talk business." After his wife left the room the business talk proceeded. This testimony, given much nearer in point of time to the event, and before a verdict for the Ismert Estate had been set aside, disclosed there was no obstacle to or impropriety in talking business with Theodore Ismert the evening the note was signed. On cross-examination Martin Ismert's attention was directed to the testimony which he gave in probate court, and he said the testimony was true.

Whenever a witness himself composes a conflict in his testimony, or corrects or supplements testimony previously given, his testimony is what he finally says it is, and it is of no consequence whether the testimony takes its settled form on direct examination, or cross-examination, or redirect examination. In this instance the court accepted Martin Ismert's testimony as including the testimony given in probate court.

Dr. George M. Gray was the physician in charge of Theodore Ismert's case. He visited his patient the evening the note was signed and shortly before the note was signed. He was called as a witness on behalf of the Ismert Estate. His direct examination, so far as material, follows:

"Q. Do you recall, Dr. Gray, being out at Mr. Ismert's house some time early in August, when Mr. Henry Ismert was there? A. Well, I remember of seeing Henry Ismert on the front porch one evening, about in the early part of August, as I was leaving the house.

"Q. Are you able to fix that well enough in you mind, doctor, to state

what condition Mr. Theodore Ismert was in at that time? A. What condition, you mean mentally or physically?

"Q. Both. A. Well, he was physically weakened down. He was more or less at that time under the influence of morphine.

. . . . . . . . . . . . . . .

"Q. Doctor, have you an opinion as to Mr. Theodore Ismert's mental condition at that time, as to whether he was able to know and appreciate mentally the effect of any of his acts? A. Are you speaking about the first of August?

"Q. I am speaking about the first of August. In that approximate time. A. Well, I would think that he was, to a certain extent. . . . I think that at that time he could be roused up so as to understand what he was doing.

"Q. But what do you mean by being roused up, doctor? A. Well, I mean by talking loud to him and getting his attention on something.

"Q. And when so aroused up, doctor, he would have the appearance, would he, of being normal? A. Well, I would not say that he would have that kind of appearance, of being normal, but you could rouse him up so I think that he could understand.

"Q. Now, doctor, when roused, how long would it be before the effect of rousing would wear away and he would sink back again? A. It would wear away right away when he was under the influence of morphine, that is, in a very few seconds.

"Q. Unless thoroughly aroused, what would his condition be, doctor? A. It would be that of stupor." ·

Now it so happened that on August 2 Theodore was at his office. On August 3, in the forenoon, he was at Martin Ismert's house and at Badorf's house. He then went home and had dinner. Then he rode about in his automobile until toward evening, when he visited Doctor Gray at the doctor's own home. There was no dispute about any of these facts. Members of the Ismert family testified that after Theodore was confined to his room, beginning August 4, his business associates visited him and talked business with him. Therefore, as the doctor's testimony stood at the close of his direct examination, it might have been the basis of utterly unwarranted inferences.

Doctor Gray was cross-examined, and as a part of his cross-examination his attention was called to testimony he had given at the previous trial. The facts relating to various transactions in which Theodore engaged up to August 22 were stated to the doctor, and he gave his opinion respecting Theodore's mental capability on those occasions. The testimony is summarized in the original opinion, and need not be reproduced here. In one instance noted in the original opinion the statement of facts, proposed as the basis for an opinion, was not in accord with some testimony favorable to the

Ismert Estate, and this court expressly excluded from consideration the doctor's opinion based on that statement. On redirect examination Doctor Gray was asked just two questions. Objections were interposed and counsel for the Ismert Estate yielded without ruling by the court.

Of course this court accepted Doctor Gray's opinions based on specific states of fact existing at specified times—matters sedulously avoided by the counsel who examined him in chief. The result of Doctor Gray's testimony was that time and again for three weeks following August first Theodore Ismert was capable of knowing what he wanted to do and of carrying out his wishes with respect to important business matters.

In the course of the original opinion the evidence relating to Theodore Ismert's physical condition was sufficiently described from the testimony of witnesses for the Ismert Estate. The testimony of some other witnesses was given showing Theodore's physical distress on certain occasions, and there was no dispute about his physical condition. The subjects of stupor from the morphine treatment, which was fully described, and stupor from toxic effect from the disease itself, were presented in the original opinion from the medical testimony produced by the Ismert Estate.

Dr. Paul Morton Krall was a witness for the Ismert Estate. He saw Theodore five or six times between the middle of July and the week prior to Theodore's death on September 4. He could not give the date of any intermediate visit. He said morphine and poisons in the system would decidedly impair Theodore's mental efficiency. He said from his observation Theodore was not able to exercise his faculties normally, his mental condition was not normal during the period within which his visits occurred, and Theodore was not able to exercise competent reasoning. He also said pain, if sufficient and long continued, would exhaust nervous composure and reserve, might lead to hysteria and unconsciousness, and would render mental efficiency not normal. The testimony of Doctor Krall just referred to was not summarized in the original opinion because it dealt in wholly indefinite and purely relative terms. They might mean something or nothing, and nobody could tell what, unless they were given specific application to concrete states of fact. The direct examination was carefully conducted to avoid any such application.

The all-important question was, What was Theodore Ismert's mental condition on the evening of August 5, when the note was signed? Two members of the Ismert family, Martin and Irene, knew everything that occurred in their father's room the evening the note was signed. The facts were not stated to the doctor, and his opinion was not requested respecting Theodore's mental normality or competency or efficiency on the single occasion when degree of mental competency was to be ascertained.

Such definite information as Doctor Krall gave was elicited on cross-examination. He was asked a hypothetical question, which as finally composed was not objected to. The Ismert Estate used the same hypothetical question in redirect examination, with the addition of a single fact. Whatever the merits or demerits of the hypothetical question, it was the sole basis of Doctor Krall's opinion respecting Theodore Ismert's competency to execute the note at the time it was executed. The doctor's answer—printed in the original opinion—to the hypothetical question was, "I do not believe he could comprehend the act, the gravity of the act." As will appear later, the court gave due consideration to the testimony.

The foregoing fairly represents the character of the medical testimony. The only reference in the medical testimony to Theodore Ismert's comprehension of the gravity of the act of signing the note appeared in the redirect examination of Doctor Krall, and his testimony on that subject was printed in the original opinion. The method of the petition for rehearing in dealing with facts when there is a printed record by which any statement of fact may be verified, is disclosed by the following:

"Pages 770 and 771 [original opinion] are largely devoted to a discussion of the testimony of the two physicians offered by defendant. No reference is made to their testimony on direct examination, where they conclusively and definitely give their opinion that Theodore Ismert was mentally incapable of understanding the nature and gravity of his act in signing the note in question."

The form of a judicial opinion in a case in which a voluminous record must be treated is always a problem. One way of solving the problem is to present as succinctly but as completely as possible the whole story of the lawsuit. This is common practice of this court and of other courts when a judgment is reversed because not sustained by the evidence. In this instance the method of complete statement was not strictly pursued. There were 432 pages of abstract, and much had to be omitted. But the court undertook, by

statement and quotation of evidence produced by both sides, to show unmistakably the positions of the chief participants in the controversy at crucial stages.

With much fustian the petition for rehearing charges the court with accepting testimony unfavorable to the Ismert Estate, with rejecting testimony favorable to the Ismert Estate, and with violating its own rules, applied through ingrained habit day after day and year after year, relating to consideration of cases on appeal.

Generally the court does not attach labels to particular items of testimony—"considered," "not considered,"—but in this instance the court did in effect do so. Martin Ismert testified concerning a conversation between Henry Ismert and Theodore Ismert, at Theodore Ismert's office, on Saturady, August 2. Martin's testimony was not in accord with Henry's testimony. After placing Martin's testimony in proper historical perspective the court said: "However, Martin so testified, and his testimony continued as follows [quoting]." (p. 757.) It did not occur to the court that it was necessary to add to the statement that Martin so testified a further statement—"and, under the established rules of this court, the court must and does give the testimony full credence and effect."

As indicated, Martin Ismert gave two accounts of what occurred while he was in the room before the note was signed. The original opinion set out all his testimony, and gave him the benefit of all of it by summarizing the substantive portions of both accounts, omitting nothing material. The summary was introduced as follows: "Accepting Martin's version of what occurred, we have," etc. The opinions of the court are not promulgated for juvenile reading, and in this instance the original opinion will not be modified to read: "Accepting Martin's version of what occurred, as the court must do and does do," etc. The argument in support of the petition for rehearing contains the following characteristic deliverance:

"In considering Martin's testimony, the court disregards it and casts it aside by saying that he gave two accounts of what occurred and setting out his testimony in each account."

Because of the rule governing consideration of cases on appeal, the original opinion did not contain a full account of the testimony relating to the all-important event of the evening of August 5. Testimony decidedly damaging to the cause of the Ismert Estate, showing Theodore Ismert's vigor of mind and full comprehension of the business he had transacted, was omitted.

Irene Ismert's testimony regarding conversation between Theodore Ismert and Henry Ismert was not in accord with Henry's testimony. Henry testified to conversation after the note was signed. He said he remained about ten minutes. Irene testified nothing more was said, and Henry left the room almost immediately. Of course Irene's testimony was accepted as absolutely true, and no reference was made to Henry's testimony. It so happened the record of meetings of the board of directors of the Sun Ray Company disclosed that on the evening of August 8, just three days after the note was signed, Henry Ismert was elected a member of the board by unanimous vote of four directors present, and was elected treasurer of the corporation. Martin Ismert was not present. How did these elections come about? Henry testified that after the note was signed Irene went out and left Theodore and Henry by themselves. Theodore asked Henry to go on the board of directors of Sun Ray, and Theodore said to Henry:

"Since Martin has got me in this hell of a jam, I want you to go over there and see that they keep things straight."

Henry promised he would do that, and he promptly went on the board of directors of Martin Ismert's company.

The court very much regrets that the petition for rehearing makes it necessary to refer to a specific charge that the court did not consider evidence favorable to the Ismert Estate.

On pages 758 and 759 of the original opinion (*Ismert-Hincke Milling Co. v. Ismert Estate*, 135 Kan. 745, 13 P. 2d 279) may be found an account of an episode of the trial. Counsel for the Ismert Estate offered testimony under a definite statement of purpose of the testimony, printed in the original opinion. The stated purpose was to show actions, demeanor and mental condition of Theodore Ismert on a certain occasion, and not for the legal effect of anything he might have said. A colloquy between court and counsel ensued. A portion of that colloquy not appearing in the original opinion follows:

"Mr. H. H. Berger [for plaintiff]: Let me make the suggestion you are offering it for the mental condition; if you will make that statement, and have the court instruct the jury that is the purpose for which it is being done, I have no objection; that it is offered on just the mental condition.

"Mr. Claflin [for Ismert Estate]: You can handle that in the instructions.

"Mr. H. H. Berger: I want it done at this time.

"MR. BARNETT [for Ismert Estate]: Let it be done at this time.
"MR. H. H. BERGER: I have no objection then.
"MR. CLAFLIN: Will the court instruct the jury that is why it is done?"

·The court then instructed the jury precisely in accordance with the understanding disclosed. The instruction appears in the original opinion. Then the witness testified, and testimony very damaging to plaintiff's cause was gotten before the jury, if the testimony were not considered according to the representation of counsel and the instruction of the court. In the brief of counsel for the Ismert Estate filed in this court, the testimony was used, in argument, for the damaging purpose. The court said the argument had no place in a brief in this court, and pointed out that if considered for the stated purpose, the testimony was damaging to the cause of the Ismert Estate. Of course counsel for the Ismert Estate could not complain of action of the district court which counsel induced by their original proposal. No complaint was made of the district court's action by anybody, and the propriety of the court's action was not and could not be questioned here.

Notwithstanding this court's stated attitude regarding professional propriety of getting evidence admitted under a distinct representation of purpose, and then using the evidence for a purpose violative of the representation and violative of an instruction induced by the representation, the petition for rehearing argues to this court that the evidence was admissible for all purposes, proceeds to use the evidence for the prohibited purpose, and what is equally astonishing, says that if this court should adhere to its view the court should grant a new trial so the evidence may be admitted for all purposes.

In the original opinion the court said the gravity of the step of signing the note was a matter which was settled when Theodore Ismert agreed to give the note, some days before it was signed. The petition for rehearing says:

"Thus this court has definitely and conclusively decided that Theodore Ismert agreed to give the note on Saturday. There is not a word of testimony in this record offered by defendant to support that conclusion."

It is true there was no evidence in the record.offered by the Ismert Estate to support that conclusion. It is also true there was no evidence offered by anybody else which would lead this court to that conclusion. The fact is, the court regards the evidence as forbidding that conclusion. The trouble with the petition for rehearing is, it

invented the conclusion, and the petition for rehearing is replete with such inventions.

The original opinion contained the following:

"The giving of the note was agreed to as an integral part of the financial arrangement to sustain Sun Ray's credit and keep it a going concern, which included deposit of securities with Allendorfer's bank, and it would be fatuous to contend to the contrary." (p. 756.)

The petition for rehearing discusses the subject, and concludes:

"So that it is not true that in order to provide credit for the Sun Ray to continue with its business, it was necessary for Theodore Ismert to give his note to the Ismert-Hincke Milling Company, and the record does not bear out any such situation."

The original opinion spoke of a financial arrangement of a certain character which was in fact made, and the views of the petition for rehearing concerning necessity for the arrangement are not important.

The minutes of the board of directors of the milling company show the management was directed to take immediate steps to secure a settlement of the debt due from Sun Ray. Martin Ismert testified at the trial that nobody would lend money to Sun Ray, and Sun Ray had to clear up that indebtedness. The board of directors of Sun Ray met the next day after the note was signed. The minutes of the meeting show Martin Ismert made the following announcement:

"The president announced that the books of this corporation showed an indebtedness to the Ismert-Hincke Milling Company of $168,357, and further indebtedness to Theodore F. Ismert of $4,816.76; which indebtedness prevented this corporation from obtaining further credit or operating capital."

So we have the Sun Ray Company owing a very large sum of money; it was pressed for settlement, and the debt prevented the company from obtaining credit or operating capital. Martin Ismert testified that Badorf had previously urged Theodore Ismert to give his note to the milling company so Sun Ray would continue to run. Martin Ismert testified that if his father did sign the note, Sun Ray would run. Martin Ismert testified to a conversation between Henry Ismert and Theodore in which Henry gave reasons why there was no one in position to take up Sun Ray's indebtedness to the milling company except Theodore. Martin Ismert testified the note was given to take up Sun Ray's indebtedness.

In the announcement made by Martin Ismert to his board of directors at the meeting occurring the evening of the day after the note was signed, Martin proceeded to tell how Sun Ray's debt to

the milling company had been charged to Theodore Ismert; that Theodore had succeeded to the rights of the milling company against Sun Ray; and that the officers of Sun Ray offered to Theodore a demand note of the corporation for the amount of the milling company debt Theodore had assumed, plus Sun Ray's debt to Theodore individually. Sun Ray's board then adopted the following resolution:

*"Be it Resolved,* That this corporation, by and through its board of directors, execute to Theodore F. Ismert a demand promissory note in the sum of $173,156.76, in payment of the obligation heretofore held against this corporation by the Ismert-Hincke Milling Company, and also the obligation heretofore held against this corporation by Theodore F. Ismert, . . ."

Martin Ismert, as president of Sun Ray, executed the corporation's note to his father provided for by the resolution. The matter of Theodore's taking over Sun Ray's debt to the milling company by note was entered on the books of both corporations. The arrangement for operating capital was completed by deposit of securities with the bank, by George Hincke and Theodore Ismert. Martin Ismert was an actor in the deposit of his father's securities, and he testified Sun Ray got the money. Not long afterward the money was repaid, and the securities deposited by Theodore Ismert and George Hincke were returned. Six and a half months after the note sued on was given, and after Theodore Ismert's death, $40,000 were paid, and payment was indorsed on the note.

George Hincke was in Theodore Ismert's office on the day the arrangement was made with Allendorfer for operating capital for Sun Ray. Hincke was to furnish liberty bonds as his share of the security for $50,000 to be advanced to Sun Ray. A "guaranty" to the bank was to be signed. Hincke testified he went to St. Louis, got his bonds from the Mercantile Trust Company of St. Louis, and had the trust company forward them to the Kansas City bank for delivery or disposition by Henry Ismert. Then Hincke went on to his home at Pinckneyville, Ill. The date of the arrangement with Allendorfer was not definitely fixed by the testimony. It was said to be the last of July or the first of August, and the first of August was Friday. At the trial Hincke produced a letter written by Henry Ismert dated August 4, which was Monday. It was addressed to Hincke at Pinckneyville. The letter referred to an inclosure, and Hincke testified he received the letter and the inclosure. The letter is printed in full in the original opinion, and correctness of its date is not disputed by the petition for rehearing. The letter establishes

the fact that by Monday Henry Ismert had been to the Kansas City bank, had received George Hincke's forwarded bonds, and had received "the papers"—the guaranty—sent to Hincke for his signature. There are classes of evidence that a jury is not permitted to reject, and this court said the letter revealed progress of certain events up to the time it was written. The court also said the letter showed signature of the note to the milling company was just as much one of the things to be.done by Theodore Ismert as execution of papers to the bank. That was the evidentiary force and effect of the letter, and the petition for rehearing does not question the court's declaration on that subject.

The answer of Ismert Estate to plaintiff's petition was not that when Theodore signed the note he did not know or understand the nature of the transaction itself. The answer was that "he did not realize the effect of his act in signing the note." The testimony of Doctor Krall, of Mrs. Ismert, and of Martin Ismert, to the same effect as the pleading, is printed in the original opinion.

The result of the foregoing is, there is no twilight zone affording opportunity for difference of opinion. We have, or we do not have, a business problem, a proposed solution of that problem, and that solution carried out well toward the point where the whole matter would become a closed incident. What is there in the record to create a conflict in the evidence sufficient to justify a jury in re-. jecting the sole conclusion derivable from the mass of evidence which has been presented?

The original opinion included the testimony relating to the conference between Theodore Ismert, George Hincke, Badorf, and Allendorfer, vice president of the First National Bank of Kansas City, Mo. The purpose was to establish the arrangement for obtaining operating capital for Sun Ray. The evidence was considered for that purpose only. The petition for rehearing says Allendorfer was not called to prove what occurred. It would be mere shuffling to contend this interview did not take place. All details of the arrangement effected were carried out precisely as agreed on.

Martin Ismert testified his father helped get some money; it was not contingent on straightening out Sun Ray's account with the milling company, and he never heard of that.

Martin did not become connected with Sun Ray until August 1. He did not pretend he was present at or had anything to do with the formulation of any arrangement which was in fact made for

getting money for Sun Ray for any purpose. What he thought or believed or opined was not evidence of any fact, and the court did not consider the testimony as having substantial value as proof of the terms of any business negotiation or transaction.

Martin Ismert testified that on Saturday, the day George Hincke was in St. Louis getting his bonds, he heard a conversation between Henry Ismert and Theodore about signing the note. The testimony has already been referred to, and appears on page 757 of the original opinion.

As a part of the business conversation relating to signing the note, Martin advised his father not to sign, and left the room. Irene came in, and Irene testified Henry Ismert said: "Theodore, I want you to sign this note. It won't affect you any, and it is the only way we can get money at the bank." (Original opinion, p. 768.) Then Theodore called for the pen, and signed the note.

There is nothing else of sufficient importance to deserve mention bearing on the subject of how the note came to be executed, and the court holds there was no evidence having that substantiality and probative force necessary to create a conflict in the evidence on that subject.

The case of *Kemp v. Railway Co.*, 91 Kan. 477, 138 Pac. 621, was decided in 1914. The opinion was formulated by a distinguished jurist, Justice Benson. The following excerpts from the opinion are pertinent here:

"After careful consideration we are constrained to hold that a candid mind acting normally could not reasonably infer  . . .

"Courts should be careful not to encroach upon the province of jurors when the facts, although undisputed, are such that the minds of candid persons may draw differing inferences and arrive at opposing conclusions. This wholesome rule, however, should not be stretched so far as to relieve the court from the solemn duty of deciding the issue in cases like this where such divergence, cannot be found consistently with reason and justice. In such a situation the question is one of law only." (p. 483.)

What conclusion would a candid mind, acting normally and consistently with reason and justice, be obliged to reach concerning the origin of the note sued on? The court's answer to this question was expressed in the original opinion.

The court is satisfied with the conclusion stated in the original opinion, that there was no substantial evidence that Theodore Ismert was mentally incompetent to execute the note. One matter, however, must be referred to.

The opinions, professional and lay, that Theodore could not appreciate the gravity of the act and did not realize the consequences of the act, were quoted in the original opinion. The court said they were not important. · This did not mean the court cast them aside and refused to consider them. The statement that they were unimportant was the result of considering them.

A feeble-minded person, whose signature was procured to a promissory note, might not know the nature of the instrument and might not know that the consequence of signing it would be that it had to be paid and could be collected from the property of the maker. In such a case it would be proper to say the note was invalid because the maker did not appreciate the gravity of the act of signing and did not realize the consequences of signing. The law forbids that to be said of a note given by a person who had capacity to understand the nature of the transaction. Otherwise a multitude of obligations might be legally avoided, from a mortgage on his home, given by a person of limited means, to buy an expensive automobile in order to keep up with the Joneses, to the postwar debts of European nations to the United States.

There is no standard of gravity of signing a note. Suppose Doctor Krall were umpire in those matters. He testified concerning a form of mental efficiency as follows:

"The matter of reasoning efficiency is a relative term; and what I might think was not efficient reasoning, some other person would think was very efficient; so when I say Mr. Ismert could not reason efficiently, it is possible that every other person that went in there might think that his reasoning was very efficient."

That is true of estimation of gravity of an act.

Doctor Krall did not specify any consequences he had in mind which Theodore did not realize, and neither did the lay witnesses. They might have had entirely different views of the matter. Because of this indefiniteness and uncertainty their opinions conveyed no information to the jury, and a jury does not have a roving commission to consider any kind of consequence.

Counsel for the Ismert Estate made an impassioned plea to the jury that, on the brink of death, Theodore beggared his family by signing this big note. Suppose· Sun Ray had been honestly and efficiently managed, business conditions had been normal, $40,000 payments on the note had rapidly followed each other until the note was paid, and Sun Ray had flourished—how the Ismert family

would have lauded Theodore's business sagacity in saving Sun Ray and thereby insuring their future prosperity!

There was some testimony bearing on what Theodore Ismert thought of Sun Ray. George Hincke testified Theodore told him Sun Ray would be a very profitable business; Sun Ray would make more money than the milling company ever did, and Theodore wanted George to take more Sun Ray stock. This testimony may not be considered against the Ismert Estate, but it is interesting to note its harmony with some evidence which counsel for the Ismert Estate invoked in behalf of the estate. Theodore died on September 4. On September 13 the board of directors of Sun Ray held a meeting. The minutes were signed by Martin Ismert, president of the corporation, and by the secretary, and contained a resolution on the death of Theodore. The resolution reads in part as follows:

"WHEREAS, Because of his faith in the Sun Ray Products Company, having invested in the company practically all of his available funds and pledged his entire wealth in its behalf, thereby insuring its success and continued growth; Now, therefore, be it resolved," etc.

Besides what has been said, if when Theodore Ismert signed the note he knew and understood the nature of the business he was engaged in, the note was unimpeachable against subsequent appraisal of gravity of the act, or appraisal of consequences of the act, by anybody.

This opinion must end here. The petition for rehearing has been fully considered, and it is denied.

HARVEY, J. (concurring specially): Without being in accord with all that is said in either of the opinions in this case I concur in the orders reversing the judgment of the trial court and denying the rehearing. My reasons for so doing may be stated briefly as follows: When legal proceedings were instituted to collect the note, defendant admitted execution of the note and pleaded: First, that the note was without consideration; second, that the maker lacked mental capacity to execute it; and, third, that he had been unduly influenced to execute it.

The first of these defenses failed so completely that the trial court took it away from the jury. Appellee makes no complaint of that ruling. So the case comes to us as though it had been conceded, as it is finally adjudged, that the note was executed for a valid and adequate consideration. When an adult executes a note for a valid and adequate consideration the circumstances are rare indeed under

which he, or his personal representative, should be permitted to repudiate it as though it were a scrap of paper. Even minors, and persons who previously had been adjudged incompetent, ordinarily are required to rescind before they can defeat such notes. Here no rescission was made or attempted.

The third defense, that the maker was unduly influenced to execute the note, standing alone, has no merit in the evidence, as such evidence must be tested by rules stated in many prior decisions of this court.

Defendant, therefore, must rely on the second defense pleaded—namely, that the maker lacked mental capacity to execute the note. I agree that fact must be determined as of the time the note was executed. The jury found for defendant, and the trial court approved the verdict and rendered judgment thereon. The sole legal question before this court in this case is whether the judgment is sustained by any substantial evidence.

Let us now examine the evidence of what occurred at the time the note was executed. Three witnesses—Henry Ismert, Martin Ismert and Irene Ismert—testified on that point. Their testimony is detailed in the original opinion [135 Kan. 766 to 770, 13 P. 2d 279] and it is not necessary to reproduce it here. Passing any discrepancy in the testimony of Henry Ismert, and taking all the testimony given by each of the witnesses as to this transaction, there is nothing in any of it which shows the lack of mental capacity of the maker to execute the note. As stated in the original opinion (p. 770): "The evidence discloses full competency to execute the instrument and forbids any other reasonable inference." In my judgment that is about all there is in this lawsuit. It is undisputed in this case that the note was given to carry out a part of the plan, previously discussed by the parties, for the conduct of the business of the two corporations, and was used for that purpose. All of this is set out fully in the original opinion. The maker of the note transacted important business shortly before and for more than two weeks after the note in question was executed, concerning which no question as to his mental capacity has been raised. From the medical evidence with reference to his ability to execute the note it is clear that he had such mental ability, the only qualification being that perhaps he would not be able to appreciate the consequences, or all of them, which might flow from such an act. Naturally that is true with reference to anyone who executes a note to be paid at a substantial time in the future.