No. 36,320

MARY CATHERINE MILLS, *Appellee*, v. FRANK SHEPHERD, *Appellant.*

(157 P. 2d 533)

Opinion filed April 7, 1945.

*Owen Samuel,* of Emporia, and *Roy C. Davis, Warren H. White, Frank S. Hodge, William H. Vernon* and *E. A. White,* all of Hutchinson, were on the briefs for the appellant.

*Max Wyman* and *Erskine Wyman,* of Hutchinson, were on the briefs for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This was an action to cancel a deed and a bill of sale. Plaintiff prevailed and defendant has appealed.

Appellee, Mary Catherine Mills, was the granddaughter and sole heir at law of Mary E. McIntire, deceased. The latter was the grantor in the respective conveyances to appellant, Frank Shepherd, nephew of the deceased. The conveyances covered the home and household furnishings of the grantor which embraced all of her property. The errors assigned are the court erred in (1) overruling defendant's demurrer to plaintiff's evidence; (2) its conclusion of law the conveyances should be set aside by reason of the grantor's mental incapacity; and (3) in failing to allow defendant interest on the amounts he spent for funeral expenses of the grantor and for taxes which the court made an equitable lien on the property involved.

The findings of fact were:

"1. That Mary E. McIntire was a lady of about 81 years of age, who was living in a home which she owned. That she had had two light strokes and had also had the influenza, and that her condition became so poor that it was necessary to remove her to Broad Acres for care and treatment. That she was weak and bedfast and her physical and mental condition was very low.

"That a young couple who lived as neighbors and who had been friendly with Mrs. McIntire, called upon her at Broad Acres, and without any prompting upon their part, she offered to give them her property if they would get her out of that place. That the attending physician, who is the county doctor, saw her about once each week; that the nurse saw her daily, and the superintendent saw her often. That from the testimony of these parties, the court finds that she was in extremely poor health, both physically and mentally. That she would recognize people but that she had exaggerated ideas concerning the value of her property and its importance, and that she did not believe she was receiving proper care and treatment at the institution, and was obsessed with a desire to get away from there, and that such obsession, together with her weak

mental and physical condition, rendered her incapable of any normal judgment concerning the disposition of her property.

"2. That the defendant received a letter requesting him to come and get her about December 12, 1942, and that he came and called on her on December 16th and remained about thirty minutes while the taxi waited to take him back to town. That the next morning he consulted an attorney, who drew a deed to the home and a bill of sale to all the personal property. Then he then saw Mr. Stanley Tennant, a notary public, and the two went back to Broad Acres. That the notary public asked her if that was her free act and deed, and she stated that she wanted to give the defendant her property. That the notary public then suggested that she retain a life estate, to which she acquiesced, and that clause was inserted in the deed by the notary public, and the deed and bill of sale were executed. That the nurse and superintendent would not take any part in the transaction or be present because they believed that Mrs. McIntire was not in any condition to transact business. That the defendant then left for his home and did not return until the 30th of December, 1942, when he received information that Mrs. McIntire had died, just thirteen days after the execution of these instruments.

"3. That after receiving the bill of sale and deed upon their execution, the defendant immediately went to the court house and recorded them and that he paid the back taxes on the real estate in the sum of $12.13. That after the death of Mary E. McIntire, this defendant paid the funeral services in the sum of $195.00. That these two items were paid by the defendant in good faith and in reliance upon the validity of the deed and bill of sale, and that if he had known they were not valid he would not have paid these items and it would have devolved upon the plaintiff to have paid the same."

The conclusions of law were:

"1. That the deed and bill of sale should be set aside and held for naught by reason of the mental capacity of Mary E. McIntire at the time of the execution of the same.

"2. That the defendant should have an equitable lien against the property and estate of Mary E. McIntire in the sum of $207.13, the same being the amount of the taxes and funeral expenses mentioned in these findings.

"3. That judgment in accordance with these findings will be entered September 22, 1944."

The principal question presented on the demurrer and by conclusion of law No. 1 is the same, namely, whether the grantor possessed the necessary mental capacity to understand, in a reasonable manner, the nature and effect of her acts. Stated in another and perhaps simpler manner, did she know what she was doing? The demurrer, of course, challenged the sufficiency of appellee's evidence to establish the grantor's incapacity. Findings and conclusions of law ordinarily are based upon the evidence of both parties where both testify upon a point in issue. Here appellant concedes there was no substantial conflict in the evidence.

This case was tried to the court without a jury. Appellant states the facts "are about as set forth in the court's findings of fact." From the findings it has been observed the court based its finding of incompetency upon the testimony of appellee's witnesses, the attending physician, the superintendent of the home and the grantor's nurse. From their testimony the trier of the facts found the grantor was "incapable of any normal judgment concerning the disposition of her property." Being thus impressed with the testimony of appellee's witnesses it was clearly the duty of the court to overrule appellant's demurrer unless there was something in that testimony which compelled the sustaining of the demurrer as a matter of law.

It is appellant's contention the trial court was compelled to find the grantor was not mentally incompetent because there was testimony of the three above mentioned witnesses that the grantor knew she had a home, recognized her relatives and was willing to give her property to anyone who would get her out of the county home and take care of her.

The doctor was cross-examined concerning these matters and frankly testified the grantor was not completely insane. It was, however, his opinion the grantor was in a definitely senile condition and—"That she was incapable of understanding what the transaction meant." It was the opinion of the superintendent of the home the grantor did not possess the mental capacity to transact this business on December 16 or 17, 1942. For that reason the superintendent and also the nurse refused to act as witnesses to the execution of the instruments. The grantor was obsessed with the notion people were doing her great wrongs and injustices. She wanted to get out of the home. That was the desire of all people in her condition. Her closest neighbors and intimate friends had induced her to go to the county home. She had no one to take care of her in her own home. Concerning her condition Mr. Denton, her nearest neighbor, testified, "She was just like a baby."

There was testimony of the doctor the grantor was in an utterly senile condition. The nurse testified the grantor frequently did not remember whether she had been fed or bathed. There was other testimony which clearly indicated the conveyances to appellant did not constitute the disposition she long had planned to make of her property. A neighbor and friend testified that on various occasions over a period of approximately ten years the grantor stated she wanted appellee, her only granddaughter, to have her property when

she was gone. While in the home she had expressed to the superintendent her particular affection for appellee. She told the nurse, "she thought she had done plaintiff's mother, her daughter, an injustice in their early lives and she wished to make it up to the granddaughter by leaving the property to her."

Manifestly the evidence adduced by appellant in nowise weakened the court's opinion on the question of the grantor's incompetency. That evidence, if needed, would have fortified the court's previous conclusion. We refer to the testimony of the notary public, appellant's witness. The first visit appellant had with grantor concerning the conveyances was on December 16. According to the testimony all arrangements for the conveyances had been made with the grantor on this first visit. The only thing that remained was the execution and delivery of the conveyances. That occurred on the next day, December 17. On cross-examination the notary public was asked concerning the visit on December 17, and answered:

"Q. Did she seem to know all that he was talking about or not at that time? A. She *seemed* to, . . . after he had talked to her shortly *she seemed* to recall that *there might have been* a previous conversation about these papers.

"Q. He talked to her a little while and she remembered that they had a conversation about them? A. Yes; she *seemed* to remember it after *they had talked about it briefly, she seemed to comprehend that there had been some previous conversation about them.*" (Italics ours.)

There is another consideration which forcibly indicates the lack of the grantor's mental capacity to transact the business in question. The grantor, as stated, was obsessed with a desire to get out of the county home. It is true the deed reserved a life estate in the grantor, but it in nowise obligated appellant to obtain her release from that home or to care for her elsewhere in any manner whatsoever. There is nothing in the record before us to indicate appellant agreed orally or in writing to be bound by any obligations. The consideration in both the deed and bill of sale was "One dollar and love and affection." At the end of the deed were contained the words, "Deed of Gift." The grantor apparently, therefore, made the conveyances without the slightest legal assurance of being removed from the county home or of being cared for by appellant. The bill of sale immediately transferred the title of her household furnishings and equipment. Under all the testimony we have no hesitancy in concluding there was ample testimony to support the finding the grantor was incapable of exercising any normal judgment concerning the disposition of her property.

In *Ismert-Hincke Milling Co. v. Ismert Estate,* 136 Kan. 617, 16 P. 2d 521, the well-established rule was stated as follows:

"The ultimate legal standard of mental capacity to execute a will or promissory note is competency to know and understand the transaction." (Syl. ¶ 1.)

In 17 C. J. S., Contracts, § 133, the rule is stated thus:

"The test of mental capacity to contract is whether the person possesses sufficient mind to understand, in a reasonable manner, the nature and effect of the act in which he is engaged." (p. 482.)

This rule is, of course, applicable to all instruments including deeds. (*Mann v. Staatz,* 156 Kan. 275, 133 P. 2d 103.)

A person may therefore understand the general nature of a deed and not be capable of exercising a reasonably normal judgment concerning the disposition of property made thereby. The mere fact a grantor recognizes his relatives, knows he has property and signs a deed does not necessarily mean he is mentally competent to understand both the nature and the effect of what he is doing.

The third assignment of error, previously stated, does not require extended treatment. Appellant contends the court erred in refusing to allow interest on the funeral expenses of the grantor and on the amount of taxes he paid on the property. He asks this court to allow interest on those items from the dates of payment. That particular request is denied but under provisions of G. S. 1935, 41-104, appellant was entitled to interest from the date of judgment at the rate of six percent per annum on the amount of the judgment lien allowed on the property. The judgment of the trial court is ordered modified to the extent of the interest item. In other respects the judgment will be affirmed. It is so ordered.